OPINION OF THE COURT
Chief Judge Cooke.
 The Public Utility Eegulatory Policies Act of 1978 (PURPA) (Pub L 95-617) does not preempt this State from requiring electric utilities to offer to buy energy from those alternate energy producers, that qualify under both Federal and State law, at a rate in excess of the maximum rate under PUEPA. However, the State is preempted by provisions of the Federal Power Act (FPA) from requiring electric utilities to offer to purchase power from purely State qualifying alternate energy facilities.
*431 Responding to the nationwide energy crisis, Congress enacted PURPA in 1978 for the purpose of encouraging the development of alternate energy sources, in order to reduce this country’s dependence on traditional fossil fuels (see FERC v Mississippi, 456 US 742, 750). Accordingly, section 210 of PURPA (16 USC § 824a-3 [a]) mandates the Federal Energy Regulatory Commission (FERC) to prescribe rules that will foster development of qualifying cogeneration facilities and qualifying small power production facilities.[1] By further directing FERC to promulgate rules requiring electric utilities to offer to sell and purchase electric energy to and from such Federal qualifying facilities, Congress hoped to eliminate one of the central problems that had hindered the development of alternate energy sources: traditional electric utilities were reluctant to buy power from, or sell power to the alternate power producers (see FERC v Mississippi, supra, at p 750, and n 12).
With respect to the regulatory rates established by. FERC for purchases by electric utilities, PURPA directs that they be (1) just and reasonable to the electric consumers of the utility, (2) in the public interest, and (3) not discriminatory against qualifying cogenerators or small power producers (see 16 USC § 824a-3 [b]). PURPA further limits the purchase rate by providing that FERC may not establish a rate that exceeds the purchasing utility’s “avoided cost”[2] (see id.).
A second barrier to alternate energy producers was the applicability of voluminous Federal and State utility regulations, involving tremendous amounts of paperwork. To *432 avoid financially and administratively overburdening qualifying facilities, section 210 of PURPA authorizes FERC to exempt many Federal qualifying facilities from certain Federal and State laws, including the Federal Power Act (FPA) (see 16 USC § 824a-3 [e] [1]; 18 CFR 292.601), when deemed necessary in order to encourage alternate power producers to enter the field (see FERC v Mississippi, 456 US 742, 750-751, supra; 1978 US Code Cong & Admin News, p 7832).
After the enactment of PURPA, New York State passed a similar law in 1980 (L 1980, ch 553, § 7, as amd by L 1981, ch 843, § 9, Public Service Law, § 66-c). Its purpose is to promote State energy goals of development of alternate energy production facilities, cogeneration facilities, and small hydro facilities (see Public Service Law, § 66-c; State Energy Master Plan, Final Report, vol I, pp 5-10, 29-30 [3/82]). To encourage this development, the law requires electric utilities to both sell and purchase power produced by State qualifying facilities (see Public Service Law, § 66-c, subd 1). Generally, those facilities that qualify under PURPA in this State also qualify under the State law (see Public Service Law, § 2, subds 2-a, 2-b, 2-c).[3]
Like PURPA, section 66-c of the Public Service Law requires that the purchasing rates by a utility from a State qualifying facility be just, nondiscriminatory, and in furtherance of the public policy behind the legislation. The State statute differs from PURPA, however, in that it prescribes a uniform minimum purchase price of 6 cents per kilowatt hour for electricity purchased by a utility from a State qualifying facility, rather than PURPA’s variable avoided-cost purchase rate. This State’s minimum purchase rate may at times exceed a utility’s avoided cost, the maximum purchase rate for energy from a Federal qualifying facility that can be required by FERC under PURPA (see 16 USC § 824a-3 [a]; 18 CFR 292.304 [a] [2]).
*433 After conducting hearings to implement the Federal and State legislation and regulations, respondent Public Service Commission (PSC) determined, among other things, that petitioner Consolidated Edison must offer to purchase electric energy from on-site generation facilities[4] that qualify under either Federal or State law, or both. It also required petitioner, under State law, to offer to purchase at a rate of at least 6 cents per kilowatt hour from State qualifying facilities and at a rate of at least avoided cost from any purely Federal qualifying facility under PURPA.
On September 9,1982, petitioner commenced this article 78 proceeding challenging, on Federal preemption grounds, these two aspects of the PSC’s determination.
The Appellate Division granted the petition, in part, holding that the FPA and PURPA preempted the area and, therefore, that FERC had exclusive jurisdiction to determine rates for sales of electricity at wholesale by on-site generators. The court modified the determination of the PSC by declaring that the State could only require petitioner to offer to purchase electricity from on-site generators that were Federal qualifying facilities. The required purchase of electricity from purely State qualifying facilities, however, was deemed to be under the preemptive blanket of the FPA. Further, the State requirement of a 6 cents per kilowatt hour minimum purchase rate was held invalid to the extent it conflicted with the Federally mandated maximum rate of avoided costs.
I
The first issue is whether PURPA preempts State regulation requiring electric utilities to purchase power from Federal qualifying facilities at a rate in excess of the avoided cost purchase rate required under PURPA. This court holds that PURPA has no such effect.
Based upon the Supremacy Clause of the United States Constitution (see US Const, art VI, cl 2), Federal law will prohibit the enforcement of State regulation in several circumstances. Preemption[5] will arise if the Federal stat *434 ute contains express language indicating Congressional intent to preempt the field sought to be regulated by State law (see Jones v Rath Packing Co., 430 US 519, 525). In the absence of express preemption, such may be implied from the comprehensive and pervasive nature of the Federal legislation that indicates an intention by Congress to leave “no room for the States to supplement” Federal law, or if the Federal law concerns a dominant Federal interest (see Rice v Santa Fe Elevator Corp., 331 US 218, 230). Preemption may also be found when compliance with both Federal and State law is an impossibility (see Florida Avocado Growers v Paul, 373 US 132, 142-143). Indeed, if the State law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress”, as expressed in the conflicting Federal statute, it must fall (Hines v Davidowitz, 312 US 52, 67; see, also, Capital Cities Cable v Crisp, 467 US _, _, 104 S Ct 2694, 2700).
Analysis under the supremacy clause, however, begins with the assumption that Congress did not intend to prohibit State action (see Maryland v Louisiana, 451 US 725, 746; Chicago & North Western Transp. Co. v Kalo Brick & Tile Co., 450 US 311, 317). This is especially so when the Federal enactment would displace a State statute governing an area historically regulated under the State’s police power (see Rice v Santa Fe Elevator Corp., 331 US 218,230, supra). The regulation of local electric utilities has been recognized as ordinarily arising under a State’s police power (see Arkansas Elec. Coop. v Arkansas Public Serv. Comm., 461 US 375, 387-388).
On its appeal, the PSC maintains that section 210 of PURPA does not expressly, or impliedly by reason of a pervasive scheme of Federal regulation, preempt the minimum rate provision of section 66-c of the Public Service Law. Petitioner does not contest this but, instead, asserts preemption on two other grounds: first, on the basis that there is a direct conflict between PURPA’s maximum *435 avoided-cost purchase rate and the 6 cents per kilowatt hour purchase rate set by the Public Service Law;[6] second, on the ground that the State’s 6 cents per kilowatt hour rate thwarts accomplishment of the Congressional objective that consumer rate payers not be required to subsidize the development of alternate energy producers. Subsidies allegedly would occur because the utilities would pass their increased costs of purchasing power from the alternate producers through to the ultimate consumer in the form of increased rates.
The flaw in petitioner’s direct conflict argument is that it is based upon the faulty assumption that the Federal maximum purchase rate of avoided costs was intended to be the absolute ceiling on the price that could be set by either the Federal or State regulatory authorities. This analysis begs the question of whether Congress intended only to establish a maximum rate that could be imposed by Federal regulations and to leave room for the States to separately encourage alternate power production by imposing higher rates for utility purchases of power from Federal qualifying facilities.
This court holds that there is no direct conflict between PURPA’s maximum purchase rate and the Public Service Law’s higher minimum purchase rate. The language of PURPA and its legislative history indicate that the PURPA avoided-cost rate is only the maximum in the context of the Federal Government’s role in encouraging alternate power production (see 16 USC § 824a-3 [b] [it is only a “rule prescribed (by FERC) under subsection (a)” that may not require purchase rate higher than avoided cost to utility]; Joint Explanatory Statement of Committee of Conference on PURPA, 1978 US Code Cong & Admin News, pp 7831-7832 [FERC regulation making full avoided costs the purchase rate was “meant to act as an upper limit on the price at which utilities can be required under this section to purchase electric energy”, implies leaving room *436 for requirements imposed outside this section under State law (emphasis added)]).[7]
Moreover, FERC determined that independent, complimentary State regulation in the field was not supplanted by PURPA but could be used to expand the Federal PURPA-based incentives.[8] As the administrative agency charged by Congress with implementation of PURPA (see 16 USC § 824a-3 [a], [h]), FERC’s interpretation should ordinarily be deferred to (see Zenith Radio Corp. v United States, 437 US 443,450; Train v Natural Resources Defense Council, 421 US 60, 87), unless it is arbitrary, capricious or an abuse of discretion (see American Paper Inst. v American Elec. Power, 461 US 402, 411-414, and n 7).
*437 Neither does adherence to the Public Service Law thwart the objectives of PURPA. The purposes of both the State and Federal statutes are identical; they seek to encourage the development of alternate energy production (see Public Service Law, § 66-c, subd 1). The State statute does not hinder the Federal objective; it furthers it, by enhancing the bargaining position of the alternate energy developer through a predictable, guaranteed rate of 6 cents per kilowatt hour. The Federal avoided-cost standard requires complicated calculations and may fluctuate greatly depending on, for example, the availability of inexpensive hydroelectric power, which will likely reduce the utility’s avoided costs. The stability provided by the Public Service Law to the alternate energy producers reduces the perceived risk of a project, encourages investment, and facilitates financing.
Petitioner asserts, however, that there is an equally strong objective of PURPA — to avoid consumer-ratepayer subsidies of the alternate energy producer. Arguably, allowing the State to impose a higher rate than avoided cost will conflict with this objective by inevitably leading to subsidies, as the utilities will pass their increased costs of purchasing power along to the consumer.
Petitioner misconstrues the importance of this objective to the over-all purpose of PURPA. The impact of the utilities’ mandated purchase rate on the cost to consumer ratepayers was but one factor that FERC was obliged to consider when it established avoided costs as the maximum rate to be imposed by Federal authorities (see American Paper Inst. v American Elec. Power, 461 US 402, 413-416, and n 9, supra). The Supreme Court has noted that the PURPA requirement that FERC establish purchase rates “just and reasonable to the electric consumers”, did not mandate adoption of the lowest possible reasonable rate (see id., at p 413, supra). The full-avoided-cost regulation was upheld because FERC was found to have met its obligation to consider the consumer’s interest even though the adopted rate would not provide any ratesavings. FERC’s explanation, that it was more important that the rate “provide a significant incentive for a higher growth rate” (see 45 Fed Reg 12222) and that the resulting *438 decreased reliance on fossil fuel and increased energy efficiency would benefit the ratepayers and the Nation as a whole (see id.), was accepted by the court as reasonable and, therefore, was upheld (see American Paper Inst. v American Elec. Power, 461 US 402, 414-416, supra). Thus, failure to achieve consumer ratesavings is not necessarily abhorrent to the primary purpose of PURPA, which is to encourage development of cogeneration and small power facilities (see id., at pp 404-406, supra).
Similarly, while it is recognized that ratesavings may not be achieved for consumers under section 66-c of the Public Service Law because the 6 cents per kilowatt hour rate may at times exceed current avoided costs, at least in the short run[9] (see Governor’s Bill Jacket, L 1981, ch 843; Governor’s Memorandum on approval of L 1981, ch 843, 1981, McKinney’s Session Laws of NY, pp 2627-2628), the rate does nevertheless further PURPA’s objective because it encourages alternate energy production, and in a manner suited to the needs of this State.
In sum, as none of the criteria for preemption are present, the PSC has the authority to require utilities to offer to purchase power from Federal qualifying facilities (including those which qualify under both PURPA and the Public Service Law). The PSC may also require a utility to offer to purchase power from Federal qualifying facilities at a minimum rate of 6 cents per kilowatt hour[10] in accordance with section 66-c of the Public Service Law.
II
The second issue is whether part II of the Federal Power Act (FPA) (see 16 USC § 824 et seq.) preempts the PSC from compelling utilities to offer to purchase power from facilities that qualify only under the Public Service Law.
This court holds that it does. The FPA would also preempt State regulation of the Federal qualifying facilities in New York except that they are exempted from the *439 FPA under subdivision (e) of section 210 of PURPA (see 16 USC § 824a-3 [e]; 18 CFR 292.602). The purely State qualifying facilities, however, are not eligible for this Federally authorized exemption because they are not covered by PURPA.[11]
Part II of the FPA applies “to the sale of electric energy at wholesale in interstate commerce” (16 USC § 824 [b]). Such a sale is in “interstate commerce” if the electric energy is “transmitted from a State and consumed at any point outside thereof” (16 USC § 824 [c]). The FPA was enacted to “fill the gap” left by the Supreme Court’s decision in Public Utilities Comm. v Attleboro Co. (273 US 83), which held that the States lacked power to regulate interstate sales of electricity at wholesale. Exclusive regulatory authority was delegated to FERC under the FPA (see New England Power Co. v New Hampshire, 455 US 331, 340).
There is no dispute that if transactions between petitioner and purely State qualifying facilities for the purchase of electricity are sales at wholesale in interstate commerce, the FPA preempts any State regulation in the area (see New England Power Co. v New Hampshire, supra, at pp 340-341; F. P. C. v Southern Cal. Edison Co., 376 US 205, 210).
The PSC asserts two arguments refuting FERC’s exclusive jurisdiction over purely State qualifying facilities. One is that the FPA only concerns regulations of “sales” and therefore, only the “seller”. Thus, it is reasoned that the PSC’s attempt to regulate a utility’s purchase rate is merely a permissible regulation of the “purchaser”, which Congress intended to leave to the States. The second is that the energy produced by a local State qualifying facility and purchased by a State utility is admittedly a sale for resale to the utility’s New York State consumers but it is not in interstate commerce because the energy originates and remains within the State.
As to the permissible-“purchaser”-regulation argument, there is no doubt that this State has long regulated utilities (see Public Service Law, § 110, subd 4; § 66, subd 12) *440 and that such regulation is “one of the most important of the functions traditionally associated with the police power of the States.” (see Arkansas Elec. Coop. v Arkansas Public Serv. Comm., 461 US 375, 377, supra.) Equally clear is the fact that the FPA did leave much regulation of utilities to the States and that Congress did not want to interfere with States’ rights in this area (see 16 USC § 824 [a] [“such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.”]; § 824 [b] [FPA “shall not apply to any other sale of electric energy”]). While facially appealing,[12] the argument distinguishing the admittedly preempted regulation of sellers of wholesale electricity (on-site generators) from purchasers in the same transactions (the utilities) is, upon closer examination, untenable. Such a distinction would simply achieve indirectly that which is not permitted directly (see Northern Gas Co. v Kansas Comm., 372 US 84, 91-93). In Northern Gas Co., a State’s attempt to require interstate pipeline companies to purchase gas ratably from local, State wells was rejected as an indirect attempt to impermissibly regulate wholesale prices of natural gas in interstate commerce, which could “seriously impair” FERC’s ability to regulate in the field.[13]
The PSC’s second argument is readily disposed of. An analysis under the FPA of whether a wholesale sale of electricity from an on-site generator to a utility is purely intrastate turns on scientific evidence regarding whether any of the electricity involved originates or is consumed outside the State (see FPC v Florida Power & Light Co., 404 US 453, 454-455 [FERC jurisdiction upheld on basis of scientific and technical evidence that was used to determine that electrons from a Florida utility eventually flowed into Georgia because of “commingling” of electrons at the point of interconnection with Georgia utility lines]).
It may be, as the PSC contends, that sales by the purely State qualifying facilities to petitioner remain in *441 trastate; indeed, petitioner ^admits that some may be.[14] However, this basis for State regulation, which requires scientific evidence regarding the flow of electricity, was not relied upon by the PSC in its decision. “A fundamental principle of administrative law long accepted by this court limits judicial review of an administrative determination solely to the grounds invoked by the agency, and if those grounds are insufficient or improper, the court is powerless to sanction the determination by substituting what it deems a more appropriate or proper basis” (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 593 [citations omitted]). The sole ground relied upon by the PSC, permissible regulation of purchases of wholesale electricity in interstate commerce, is erroneous, and thus, the PSC’s assertion of jurisdiction over purely State qualifying facilities is preempted by the FPA.
Accordingly, the judgment of the Appellate Division should be modified by reinstating the determination of the Public Service Commission insofar as it permits imposition on utilities of a minimum purchase rate of 6 cents per kilowatt hour for electricity generated by Federal qualifying facilities which also qualify under the Public Service Law and, as so modified, affirmed.
Judges Jones, Wachtler, Meyer, Simons and Kaye concur; Judge Jasen taking no part.
Judgment modified, with costs, to appellant, in accordance with the opinion herein and, as so modified, affirmed.

. A “cogeneration facility” is one that produces both electric energy and steam or some other form of useful energy, such as heat (see 16 USC § 796 [18] [A]).
A “small power production facility” is one that produces electric power from biomass, waste, renewable resources such as wind, water or solar energy, or geothermal resources and has a production capacity of not more than 80 megawatts (see 16 USC § 796 [17] [A]).
Each cogeneration or small power production facility will be a “qualifying” one if it satisfies the requirements regarding ownership, size, fuel use, efficiency, and reliability under PURPA (see 16 USC § 796 [17] [C]; [18] [B]).

. A utility’s “avoided cost” is the amount that it would have cost the utility to generate the same energy that it bought from the qualifying cogeneration or small power production facility, had that purchase not been made (see 16 USC § 824a-3 [d]). This is referred to in the statute as the utility’s “incremental cost of alternative electric energy.”
The purchase rate actually selected by FERC in its regulations is generally equal to avoided purchase costs and although it may be lower (see 18 CFR 292.304 [b] [2]-[3]), FERC may not require it to be higher (see 18 CFR 292.304 [a] [2]).

. Unless otherwise indicated, when the term “Federal qualifying facility” is used in this opinion, it will include facilities that are also State qualifying facilities. A “State qualifying facility” will refer to any facility qualifying under the Public Service Law, regardless of whether it is also a Federal qualifying facility. Some facilities, however, will qualify under one law and not the other (compare 16 USC § 796 [17] [18]; and 18 CFR 292.201-292.206, with Public Service Law, § 2, subds 2-a, 2-b, 2-c) and will be referred to as a “purely” State or “purely” Federal qualifying facility.

. On-site generation facilities refer, in this opinion, to all alternate energy producers regardless of whether they qualify under Federal and/or State law.

. Traditionally, the word “preemption” has referred to preclusion of State law based upon express or implied Congressional intent to do so as expressed in comprehensive *434 Federal legislation. This type of “preemption” has been distinguished from the other manner of preclusion which occurs because there is a direct conflict or inconsistency between State and Federal law (cf. Consolidated Edison Co. v Town of Red Hook, 60 NY2d 99, 104-105). Both situations, however, result in the supremacy of Federal over State law and the term “preemption” has been used to refer to both (see Capital Cities Cable v Crisp, 467 US_,_, 104 S Ct 2694, 2700; Free v Bland, 369 US 663, 664); for the purposes of this opinion, it is so used.

. Petitioner reasons that when a utility offers to purchase wholesale electricity from Federal qualifying facilities at 6 cents per kilowatt hour according to the State law, it will violate the Federal mandate, under PURPA, that the maximum purchase rate be avoided costs, which here, the PSC found to be 4.17 cents per kilowatt hour at certain off-peak times.

. While not conclusive on this issue, there are numerous references in the Congressional debates and legislative history indicating Congress’s recognition of the traditional role of the States in electric utility regulation and a desire not to infringe upon or impair the State role (see 124 Cong Rec 34558 [Senator Jackson, “(T)he essential feature of the conference agreement is the limited nature of the authority granted to the FERC”]; 123 Cong Rec 32403 [Senator Durkin, “(I) do not want to abrogate State law with respect to the regulation of utilities”]; House Conference Rep No. 95-1750, 95th Cong 2nd Sess, reprinted in 1978 US Code Cong & Admin News, p 7831 [the limitation in section 210 of PURPA of sales by qualifying facilities at wholesale was not intended to “limit the States from allowing such sales to take place”]). PURPA has been characterized as a “limited federal regulation * * * of relationships between cogenerators and electric utilities” CFERC v Mississippi, 456 US 742, 758). In addition, PURPA reserved to the States a large role in implementing, enforcing, and administering the program after FERC promulgated its regulations (see 16 USC 8 824a-3 [a], [e]-[g]).

. In the Preamble to FERC’s regulations (45 Fed Reg 12221-12222, 8 292.304 Rates for Purchases-Relation to State Programs), FERC left the States free to utilize their own means of encouraging alternate energy production, stating:
“The Commission has become aware that several States have enacted legislation requiring electric utilities in that State to purchase the electrical output of facilities * * * at rates which may differ from the rates required under the Commission’s rules implementing section 210 of PURPA.
“This Commission has set the rate for purchases at a level which it believes appropriate to encourage cogeneration and small power production, as required by section 210 of PURPA. While the rules prescribed under section 210 of PURPA are subject to the statutory parameters, the States are free, under their own authority, to enact laws or regulations providing for rates which would result in even greater encouragement of these technologies. However, State laws or regulations which would provide rates lower than the federal standards would fail to provide the requisite encouragement to these technologies, and must yield to federal Law.
“If a State program were to provide that electric utilities must purchase power from certain types of facilities, among which are included ‘qualifying facilities,’ at a rate higher than that provided by these rules, a qualifying facility might seek to obtain the benefits of that State program. In such a case, however, the higher rates would be based on State authority to establish such rates, and not on the Commission rules. * * *
“The Commission finds no inconsistency in a facility’s taking advantage of section 210 in order to obtain one of its benefits, while relying on other authority under which to buy from or sell to a utility.” (Preamble to FERC Rules, 45 Fed Reg 12214, 12221-12222.)

. If the price of fuels such as oil and gas goes up along with other costs of producing energy, the utilities “avoided cost” will be higher and may grow to exceed the rate of 6 cents per kilowatt hour.

. Of course, if the utility’s avoided costs become higher than 6 cents per kilowatt hour, Federal law would then require that the avoided-cost rate be used (see FERC Preamble, 45 Fed Reg 12221).

. It is assumed that the purely State qualifying facilities discussed here are not exempt from the FPA for another reason (see 16 USC § 824 [f]), in which case they would be subject to the State Public Service Law.

. A “sale of electric energy at wholesale” is defined as “a sale of electric energy to any person for resale” (16 USC § 824 [d] [emphasis added]), which would imply regulation of only the seller, who sells to another, not the buyer who purchases from another.

. While Northern Gas Co. was decided under the Natural Gas Act (15 USC §§ 717-717w), the distribution of regulatory power between the Federal and State governments is the same under the FPA (see F. P. C. v Southern Cal. Edison Co., 376 US 205, 211-212).

. Even if some electrons ultimately flow out of State, this State regulation may have only an incidental effect on interstate commerce while furthering legitimate local public interests and, thus, would not offend the commerce clause (see Arkansas Elec. Coop. v Arkansas Public Serv. Comm.., 461 US 375, 389-395). Arguably, if the commerce clause is not violated, the State qualifying facility may not be subject to FERC’s jurisdiction under the FPA (see id.).