In the Matter of Long Island Lighting Company, Appellant, v Public Service Commission of the State of New York et al., Respondents.

Third Department, May 19, 1988

**APPEARANCES OF COUNSEL**

*Anthony F. Earley, Jr. (John R. McDermott, Robert E. Fernandez* and *Jeffrey S. Antin* of counsel), for appellant.

*Robert A. Simpson (Marilyn Mann Faulkner* and *David E. Blabey* of counsel), for Public Service Commission of the State of New York, respondent.

*Skadden, Arps, Slate, Meagher & Flom (Richard Simon, Edwin E. McAmis* and *John Curran* of counsel), for American REF-FUEL Company of Hempstead, respondent.

**OPINION OF THE COURT**

KANE, J. P.

In early 1985, respondent American REF-FUEL Company of Hempstead (hereinafter REF-FUEL) began negotiations with petitioner, Long Island Lighting Company (hereinafter LILCO), regarding LILCO's purchase of electricity from REF-FUEL, as required by statute *(see,* Public Service Law § 66-c). REF-FUEL was planning to build and operate a solid waste-to-energy facility in the Town of Hempstead, Nassau County, in order to dispose of the town's solid waste. REF-FUEL anticipated that the facility would produce between 63.5 megawatts and 79.9 megawatts of electricity and would be classified as a "qualifying facility" under the Federal Public Utility Regulatory Policies Act of 1978 (hereinafter PURPA) *(see,* 16 USC § 796).[1]

---

1. Congress enacted PURPA to encourage the development of alternate energy sources in order to decrease this country's dependency on fossil fuels. PURPA required electric utilities to sell and purchase electric energy to and from those Federal facilities found qualified for such treatment under PURPA's rules. Thereafter, this State passed Public Service Law § 66-c,

*(n. cont'd)*

In an effort to streamline negotiations between small alternative energy producers such as REF-FUEL and electric utilities such as LILCO, respondent Public Service Commission (hereinafter the PSC) issued Opinion and Order No. 86-8 (hereinafter Opinion 86-8) on March 27, 1986. PURPA requires a utility purchasing electricity from a qualifying facility to pay the "actual avoided cost", that is, the cost the utility avoids paying by not generating or producing such power itself *(see,* 16 USC § 824a-3 [d]). In New York, Public Service Law § 66-c (1) grants the PSC the authority to set a minimum price the utility must pay but specifically prohibits the price from being lower than 6 cents per kilowatt hour (hereinafter KWH). As a result, a negotiated contract price may run greater than the actual avoided cost. However, such mandatory pricing has been upheld because such contracts afford the independent energy producers security, thus giving them an incentive to pursue alternate methods of producing electricity *(see, Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424, *appeal dismissed* 470 US 1075; *see also, American Paper Inst. v American Elec. Power,* 461 US 402).

Opinion 86-8 included a "long run avoided cost" (hereinafter LRAC) projection whereby the price actually paid by the utility would be projected at the contract's inception and last the length of the contract. It also delineated two specific contract options for nonhydroelectric facilities such as REF-FUEL. REF-FUEL's proposed contract to LILCO basically used the second option which calculated the price based on LILCO's actual avoided cost tariff rate with a negotiated floor and ceiling tied to LRAC estimates below and above which the price paid by LILCO could not go. However, no agreement was made and the parties turned to the PSC for nonbinding mediation. The areas of dispute concerned, *inter alia,* the length of the contract and its provisions for price updates. REF-FUEL sought a 20-year contract with no price updates, arguing that these provisions were necessary to guarantee it minimum payments for the life of its bonds and its contract

which had the same goals as PURPA. This statute also required electric utilities to both purchase and sell power produced by State qualifying facilities. A more detailed discussion of PURPA is found in *Federal Energy Regulatory Commn. v Mississippi* (456 US 742) and *American Paper Inst. v American Elec. Power* (461 US 402), while a more thorough explanation of Public Service Law § 66-c is provided in *Matter of Consolidated Edison Co. v Public Serv. Commn.* (63 NY2d 424, *appeal dismissed* 470 US 1075).

with the Town of Hempstead. LILCO, on the other hand, sought a 15-year contract with price updates in the sixth and eleventh years of the contract. LILCO's proposal conformed with Opinion 86-8's provisions.

The second option of Opinion 86-8 that REF-FUEL was relying on came to be known as the "cone pricing proposal" since both the ceiling and floor, as percentage functions of the steadily rising LRAC, diverged from the LRAC to form a "cone". The floor guaranteed a minimum price to REF-FUEL while the ceiling provided a maximum price that would protect LILCO should the cost of producing electricity significantly increase. Although the PSC mediation staff recommended approval of REF-FUEL's proposal, LILCO refused to accept it and REF-FUEL petitioned the PSC to compel LILCO's acceptance. Upon the advice of its Power Division, the PSC initially recommended further negotiations. As a result, a new proposal known as an "asymmetrical pricing cone" was developed wherein the floor, while never going below the statutory 6 cents/KWH minimum, would descend over time lower than the ceiling would rise above the linear LRAC. Although the ceiling would ascend at a steady rate of 20% of the LRAC, the floor would remain at the 6 cent minimum for the first five years, then decline to 20% of the LRAC for years 6 through 10, fall 25% for years 11 to 15 and 40% in years 16 through 20. The proposal also included a potential 10% reduction in the price paid to REF-FUEL in the years 2001 through 2008. Based on the Power Division's recommendations, the PSC approved the new proposed contract and ordered LILCO to sign it. Upon the denial of its motion for a rehearing, LILCO signed the contract under protest and commenced the instant CPLR article 78 proceeding. Supreme Court dismissed LILCO's petition and LILCO has appealed.

▪ Initially, LILCO claims that the floor of the pricing cone exceeds the statutory 6 cent/KWH minimum and that in these times of low oil prices, this provides an unfair windfall to REF-FUEL while unfairly burdening LILCO's ratepayers.[2] However, as the Court of Appeals specifically pointed out in *Matter of Consolidated Edison Co. v Public Serv. Commn.* (63

---

2. Although not applicable to this case, we take note of the Federal Energy Regulatory Commission's recent ruling that States cannot impose a rate exceeding avoided cost on purchase of power. Its decision was issued April 14, 1988 and specifically noted that its application was prospective only (1988 FERC Order on Petition for Declaratory Order, No. EL87-53-000, at 23).

NY2d 424, 438, *supra),* "failure to achieve consumer ratesavings is not necessarily abhorrent to the *primary* purpose of PURPA, which is to encourage development of cogeneration and small power facilities" (emphasis supplied). LILCO's argument is based in part on the claim that the pricing cone violates Federal law because it departs from actual avoided costs when such costs may fall beneath the floor. Again, however, in *Consolidated Edison* the court noted that although the 6 cent minimum might not provide ratesavings because it could at times exceed actual avoided costs, the rate still furthered PURPA's objective of encouraging alternate energy production and was therefore valid *(supra,* at 438). Similarly, in this case, although the pricing cone could result in costs higher than actual avoided costs, it did not violate Federal law.

■ LILCO also claims that the pricing cone violates State law since it sets a compulsory price above the statutory minimum of 6 cents/KWH. However, the clear language of Public Service Law § 66-c (1) (a) belies this argument: "the [PSC] shall require any electric corporation * * * to enter into long-term contracts to purchase * * * electricity * * * from any * * * co-generation facility under such terms and conditions as the [PSC] shall find just and economically reasonable * * * provided, however, the [PSC] shall establish a minimum sales price for such purchased electricity * * * of *at least* six cents per kilowatt hour for each utility" (emphasis supplied). Thus, the 6 cent/KWH price is only a minimum that the PSC must impose and in requiring a higher price, it is limited only by the phrase "just and economically reasonable", a criterion we find to have been satisfied in the instant case. As the PSC noted, "the proposed floor price is low enough to encompass most conservative projections of avoided costs". Therefore, we find no violation of either Federal or State law by the PSC in ordering LILCO to sign the contract.

■ LILCO next asserts that the PSC violated its own guidelines as set forth in Opinion 86-8 and therefore its determination accepting the contract was arbitrary and capricious. LILCO argues that Opinion 86-8 mandated a maximum contract duration of 15 years with cost evaluations in the sixth and eleventh years. Although Opinion 86-8 did provide for both of these clauses, it was specifically stated that they were "minimum options" that did not "bar parties from agreeing to different contract provisions suitable to the circumstances of a particular project. We continue, therefore, to encourage devel-

opers and utilities to engage in *good faith* negotiations" (emphasis supplied). In our view, Opinion 86-8 provided only guidelines and the PSC was not bound to impose these guidelines on the parties during mediation. Here, REF-FUEL initially and continually sought a 20-year contract with no renegotiation provisions. It rejected the alternatives offered by LILCO on the ground that they failed to provide the revenue needed to finance the project. With the PSC mediating, LILCO set conditions for accepting a 20-year contract and when these were rejected, LILCO refused to participate further in the mediation. The "asymmetrical pricing cone" and the 10% reduction proposal were then set forth by the PSC and agreed to by REF-FUEL. These were reasonable attempts by the PSC to meet LILCO's objections to the contract length and the floor price. Since the PSC's decision involved factual evaluations of areas within its particular expertise, and its decision is supported by the record, we decline to disturb its determination with respect to the contract's length and lack of update procedures *(see, Flacke v Onondaga Landfill Sys.,* 69 NY2d 355, 363).[3]

■ However, we reach a different conclusion with respect to another provision set forth in Opinion 86-8. In providing for what LRAC would apply to which contracts, Opinion 86-8 clearly mandated that the LRAC set forth therein would apply only to those facilities commencing operation before 1989 and an entirely new LRAC would apply to facilities commencing operations in 1989. Here, REF-FUEL is set to start producing electricity in 1989; therefore, under Opinion 86-8, new LRAC estimates appear to be applicable.

As Public Service Law § 23 (1) states: "Every order of the [PSC] shall take effect at a time therein specified and shall continue in force either for a period which may be designated therein or until changed or abrogated by the [PSC]". Here, no change was made in the rule and it therefore remained in full force and effect at the time the contract was signed. Furthermore, the PSC gave no explanation in its order requiring

3. We also reject the claim that the PSC's reliance on a "sensitivity analysis" performed by its staff was improper since it was not part of the record. This analysis was only an evaluation of the effect of depressed oil prices on LRAC estimates and PSC staff informed LILCO that its evaluation would take into account these lower prices. This information was available to LILCO and the PSC's decision to conduct an independent analysis was not improper *(see, Matter of ADT Co. v Public Serv. Commn.,* 128 AD2d 1, 4-5).

LILCO to sign the contract for applying the 1986 LRAC to REF-FUEL. An agency is required to set forth its reasons for altering a prior course and without such an explanation, a reviewing court is unable to determine whether the agency had valid reasons for its actions *(see, Matter of Field Delivery Serv. [Roberts],* 66 NY2d 516, 520). Even if the record contains substantial evidence to support the determination, this court may not substitute what it deems to be the appropriate basis *(see, supra; see also, Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424, 441, *supra).* The determination should therefore be modified by annulling so much thereof as determined that the 1986 LRAC should apply and the matter should be remitted to the PSC for further proceedings on this issue. In so doing, we emphasize that the PSC's use of the 1986 figures was not necessarily irrational; however, to permit proper judicial review, the PSC should explain its reasoning for the departure from Opinion 86-8 with regard to an updated LRAC.

As a final matter, we reject LILCO's suggestion to consider in the "interest of justice" an interim policy statement issued by the PSC subsequent to the parties signing the contract wherein the PSC acknowledges that actual avoided costs of utilities are currently running below the statutory 6 cent/KWH minimum. The policy statement specifically enunciated its prospective only nature. At the time the contract was signed, the pricing cone was a rational approach to the dual policy of encouraging cogeneration and protecting ratepayers. Additionally, the contract not only protects REF-FUEL from too precipitous a drop in oil prices, it also protects LILCO against a dramatic increase in such prices.

WEISS, LEVINE, HARVEY and MERCURE, JJ., concur.

Judgment modified, without costs, by reversing so much thereof as dismissed the petition; remit the issue of why the 1986 LRAC was followed to respondent Public Service Commission for clarification of its reasons for doing so; and, as so modified, affirmed.