[802 NE2d 1084, 770 NYS2d 686]

STEVENS AND THOMPSON PAPER COMPANY, INC., Appellant, v NI-AGARA MOHAWK POWER CORPORATION, Respondent.

Argued October 16, 2003; decided November 25, 2003

## POINTS OF COUNSEL

*Read and Laniado, LLP,* Albany (*Howard J. Read* and *Steven D. Wilson* of counsel), for appellant. I. The Stevens and Thompson Paper Company power purchase agreement is grand-fathered under the 1992 amendment to Public Service Law § 66-c and is entitled to the six cents minimum rate for the remainder of the contract term. (*Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424; *Federal Deposit Ins. Corp. v Niagara Mohawk Power Corp.,* 102 F3d 671.) II. The court below ignored both the requirements of Public Service Law § 66-c and established Commission policy. (*Matter of Long Lake Energy Corp. v Public Serv. Commn.,* 148 AD2d 84; *Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424; *Niagara Mohawk Power Corp. v Federal Energy Regulatory Commn.,* 162 F Supp 2d 107, 306 F3d 1264.)

*Kevin P. Glasheen,* Albany, and *Hiscock & Barclay, LLP* (*Michael J. Smith* of counsel), for respondent. I. The Appellate Division decision is not adverse to the legislative goals associated with the 1992 amendment to Public Service Law § 66-c. (*Matter of Consolidated Edison Co. v Public Serv. Commn.,* 63 NY2d 424, 470 US 1075; *Norcon Power Partners v Niagara Mohawk Power Corp.,* 92 NY2d 458; *Federal Deposit Ins. Corp. v Niagara Mohawk Power Corp.,* 102 F3d 671; *Matter of Coastal Power Prod. Co. v New York State Pub. Serv. Commn.,* 153 AD2d 235.) II. The Appellate Division correctly determined that the grandfathering provisions of Public Service Law § 66-c (2) were not applicable to the 7.5 megawatts of new capacity at the Stevens and Thompson Paper Company plant. (*Matter of F.W.E. Stapenhorst, Inc. v Public Serv. Commn.,* 75 NY2d 577.) III. The Appellate Division decision is not adverse to Public Service Commission policies. (*American Cyanamid Co. [Lederele Labs. Div.] v Public Serv. Commn.,* 88 AD2d 1063; *Matter of New York Tel. Co. v Public Serv. Commn.,* 179 Misc 2d 301; *Matter of Campo Corp. v Feinberg,* 279 App Div 302, 303 NY 995; *Matter of Niagara Power Corp. v Public Serv. Commn.,* 69 NY2d 365; *Matter of Central Hudson Gas & Elec. Corp. v Public Serv.*

160

*Commn.*, 108 AD2d 266; *Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn.*, 135 AD2d 4; *Matter of Long Lake Energy Corp. v Public Serv. Commn.*, 148 AD2d 84; *Matter of Xiox Corp. v Public Serv. Commn.*, 190 AD2d 350; *Matter of Long. Is. Light. Co. v Public Serv. Commn.*, 199 AD2d 831; *Matter of F.W.E. Stapenhorst, Inc. v Public Serv. Commn.*, 75 NY2d 577.)

### OPINION OF THE COURT

CIPARICK, J.

This appeal requires us to determine whether a power purchase agreement (PPA) between a utility, Niagara Mohawk (NIMO), and a generator of electricity, Stevens and Thompson (S&T), is subject to the grandfathering provisions of Public Service Law § 66-c (2) (a) (ii), and thus subject to the six cent per kilowatt hour minimum rate for the 7.5 megawatts of "new" capacity generated by S&T for the remainder of the agreement. We conclude that the grandfathering provision is not applicable to this PPA and that the appropriate payment rate for the "new" capacity is NIMO's actual avoided cost.[1]

Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA) (Pub L 95-617) in order to help foster the development of alternative sources of energy (*see Matter of Consolidated Edison Co. v Public Serv. Commn.*, 63 NY2d 424, 431 [1984]). New York Public Service Law § 66-c was enacted soon thereafter to fulfill the same purposes at the state level (Public Service Law § 66-c [1]). It provided for a minimum sales price of six cents per kilowatt hour for electricity purchased from qualifying facilities by utilities. The provision requiring the six cent minimum was removed from section 66-c (1) in 1992 and section 66-c (2) was added (L 1992, ch 519, §§ 3, 4).

Section 66-c (2) is a grandfathering provision allowing certain agreements to continue to function under the six cent minimum rate if the agreement was executed by the parties and filed with the Public Service Commission by June 26, 1992, and the agreement "provid[es] for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price . . . provided, however, that such minimum sales price shall be implemented

---

1. Avoided cost, also termed "incremental cost of alternative electric energy," is defined as what the cost would have been to the utility to either produce or purchase from a different source the energy generated by the qualifying facility (*Matter of Consolidated Edison Co. v Public Serv. Commn.*, 63 NY2d 424, 431 n 2 [1984], quoting 16 USC § 82a-3 [d]; 18 CFR 292.101 [b] [6]).

in accordance with the policies and conditions established by the commission" (Public Service Law § 66-c [2] [a]). The six cent minimum rate was apparently repealed because the rate turned out to be an overestimate of the cost of production of electricity by the qualifying facilities, resulting in the imposition of overpayments on the utilities and their customers. The Governor's Approval Memorandum in support of the repeal and the grandfathering provision stated "[c]onsumers are thereby relieved of the outdated minimum sales price while reasonable protection is provided to producers who relied on this minimum price provision" (Governor's Mem approving L 1992, ch 519, 1992 McKinney's Session Laws of NY, at 2898).

S&T owns and operates a small hydroelectric generating facility that had an original capacity of three megawatts (MW)—referred to as "old" capacity. The facility was replaced in 1986, increasing its capacity by an additional 7.5 MW of "new" capacity, for a total existing output of 10.5 MW. S&T and NIMO entered into a PPA pursuant to Public Service Law § 66-c (1) (a) in January 1987 whereby NIMO was required to purchase the entire 10.5 MW capacity of electricity generated by S&T.

The PPA was divided into three time periods—the first period ending December 31, 2000, the second December 31, 2008, and the third December 31, 2016. For purposes of this appeal, the only contract provisions at issue are those that relate to the rate that must be paid for the "new" capacity during the second and third periods.[2] The PPA states that for the second period, in consideration for a longer contract term, NIMO will pay S&T 90% of its avoided cost and recognizes that the discount may result in payments that are below any applicable minimum rate.[3] The PPA goes on to define avoided cost as

> "such actual cost of electric production . . . avoided by reason of this AGREEMENT, as defined in Service Classification No. 6 of PSC No. 207 Electricity as the same may be from time to time changed, amended and/or supplemented, the tariff duly approved by the COMMISSION applicable for payments to qualifying on-site generation suppliers whose

---

2. With respect to the 3 MW of "old" capacity, NIMO is required to continue to pay S&T at the Service Classification No. 6 tariff rate, subject to the six cent minimum for the balance of the agreement.

3. This 90% discount provision was later eliminated from the PPA by a December 1986 order of the Commission (see Pub Serv Commn Case No. 29448, issued Dec. 3, 1986).

sales of capacity and energy to NIAGARA are made under the terms of such tariff."

For the third period, NIMO would pay S&T 80% of its avoided cost at "the rate contained in Service Classification No. 6."[4]

NIMO's tariff, Service Classification No. 6 (SC No. 6), sets forth a formula to be applied for determining the rate to be paid by NIMO to qualifying facilities. The tariff provides "[t]o the extent that a minimum unit rate applied under Section 66-c of the Public Service Law . . . the rate to be paid under this service classification shall be no less than 6.0 cents per kWh."

Before the parties executed the PPA, the Commission issued an order directing certain terms (see Pub Serv Commn Case No. 29448, issued Dec. 3, 1986). The Commission determined that mere agreement between the parties to extend the PPA for longer than 15 years was insufficient consideration to allow NIMO to purchase the electricity at a discounted rate (see Pub Serv Commn Case No. 29448, issued Dec. 3, 1986).[5] The Commission also

> "direct[ed] Niagara Mohawk to enter into a [30]-year contract that provides for payment at the settlement rates for the increase in capacity resulting from the proposed facility through the year 2000 and thereafter through the end of the [30]-year term at full avoided costs. With respect to the 3 MW representing existing capacity, the payment rate will be tariff-based avoided costs, subject to the statutory minimum, throughout the [30]-year term of the contract" (Pub Serv Commn Case No. 29448, issued Dec. 3, 1986).[6]

S&T commenced this action in May 2001 after the expiration of the first payment period because, as of February 2001, NIMO stopped paying S&T at the six cent minimum rate for the entire

---

**4.** The 80% discount provision was similarly eliminated from the PPA by the December 1986 Commission order (see Pub Serv Commn Case No. 29448, issued Dec. 3, 1986).

**5.** Although the PPA was never amended to reflect the changes directed by the December 1986 order, the parties have apparently abided by the terms of the order as if the PPA had been amended. As a result, it is necessary to look to the December 1986 order to ascertain the "final" agreement between the parties.

**6.** The agreement incorrectly stated that the term of the contract would be 40 years. An errata notice was later issued to clarify that the term of the contract would be 30 years (see Pub Serv Commn Case No. 29448, Errata Notice, issued Jan. 7, 1987).

capacity—instead paying only NIMO's avoided costs. S&T sought declarations that the PPA was within the grandfathering provisions of section 66-c, and thus subject to the six cent minimum, and that NIMO could not legally pay S&T at a rate below the six cent minimum. S&T also sought damages for the difference between the rate it was actually paid—NIMO's avoided costs—and the six cent rate, with interest, and further, to enjoin NIMO from paying it at a rate less than six cents per kilowatt hour. The parties cross-moved for summary judgment pursuant to CPLR 3212.

Supreme Court granted each party's motion in part, finding the PPA was grandfathered because it was in effect prior to June 26, 1992, the effective date of the amendment, and incorporated the six cent minimum through the SC No. 6 tariff. The court then determined that, for the second and third periods, NIMO must pay its actual avoided costs for the "new" capacity and the tariff-based avoided costs subject to the six cent minimum for the "old" capacity. The court based its decision, in part, on the language in the Commission's December 1986 order differentiating between "full avoided costs" for the "new" capacity—without mentioning the six cent minimum— and "tariff-based avoided costs, subject to the statutory minimum" for the "old" capacity.

The Appellate Division affirmed for different reasons. That Court found the PPA was not grandfathered because, while NIMO's tariff did refer to the six cent minimum, the reference was not in the context of the definition of avoided cost, and thus the PPA did not explicitly provide that the purchase of electricity would be at the utility tariff rate (299 AD2d 628, 630 [2002]). The former six cent statutory minimum was not applicable to the electric production for the 7.5 MW of "new" capacity. This Court granted S&T leave to appeal and we now affirm.

There is no dispute that the PPA at issue was signed by the parties and filed with the Commission prior to June 26, 1992, the effective date of the amendment. This fact alone does not result in automatic entitlement to the six cent minimum. The pertinent question here is whether the PPA "provid[es] for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price" (Public Service Law § 66-c [2] [a] [ii]). The PPA provides that S&T will be paid at NIMO's "avoided cost," which is described as the cost of the production of electricity NIMO would have incurred in the absence of the PPA, as defined in SC No. 6. NIMO's tariff, SC No. 6, clearly

references the six cent minimum as part of a section entitled "RATE TO BE PAID BY COMPANY." Although the PPA appears to fit within the grandfathering provision, the inquiry does not end there. The statute further specifies that the six cent minimum will continue to apply "provided, however, that such minimum sales price shall be implemented in accordance with the policies and conditions established by the commission" (Public Service Law § 66-c [2] [a]).

The Public Service Commission has not interpreted the "avoided cost" language at issue here since the six cent minimum was repealed and the grandfathering provision was enacted. In fact, the Commission has specifically declined to do so, stating

> "[w]hile, under PURPA and PSL § 66-c, we supervise the . . . contract formation process, we have avoided involvement in contract disputes between utilities and [qualifying facilities] over the meaning of contract terms, arising after contract formation. Such contract disputes are better resolved according to commercial law principles, through negotiation, arbitration, or the courts" (Pub Serv Commn Case No. 02-E-0891, *Orange and Rockland Utilities, Inc.—Tariff Filing to Update its Rates for Buyback Service Under S.C. No. 15*, issued Dec. 20, 2002; *see also* Pub Serv Commn Case No. 01-E-0193, *Niagara Mohawk Power Corporation—Tariff Filing to Clarify the Applicability of the 6 [Cent] Rate for Contracts with Independent Power Producers*, issued June 6, 2001).

However, the Commission interpreted this specific PPA and the language at issue in its December 1986 order prior to the January 1987 execution of the agreement.[7] That order, representing the "final" agreement between the parties, directed NIMO to pay S&T "full avoided costs" for its "new" capacity for the second and third periods of the agreement and to pay "tariff-based avoided costs, subject to the statutory minimum" for the "old" capacity for the entire term of the agreement. As such, the order drew a distinction between avoided costs and the tariff-based avoided costs subject to the six cent minimum. This policy interpretation was established by the Commission

---

7. S&T did not seek review by CPLR article 78 of the Commission's December 1986 order or the denial of its petition for rehearing.

for this particular agreement. As the agency charged with the administration of the Public Service Law, the Commission's interpretation of the agreement in this highly technical area of law is entitled to deference (*see Matter of New York Tel. Co. v Public Serv. Commn.*, 95 NY2d 40, 48-49 [2000]; *see also Matter of Niagara Mohawk Power Corp. v Public Serv. Commn.*, 69 NY2d 365, 369 [1987] [noting that the Public Service Commission "has been granted 'the very broadest of powers' " in its rate-setting authority]). Thus, the "new" capacity is not entitled to the benefit of the grandfathering clause because, "in accordance with the policies and conditions established by the commission" (Public Service Law § 66-c [2] [a]), the December 1986 order reveals a policy that S&T would only be entitled to avoided costs for that capacity during the second and third periods of the PPA.

We reject S&T's arguments that full avoided costs include the six cent minimum or that the Commission's policy was to use the six cent minimum as a base price for the tariffs, in light of the Commission's December 1986 order—*the* operative order—addressing this particular PPA. In addition, any argument that the parties contemplated the six cent minimum at the time of the agreement negates the purpose of the grandfathering clause, which limits application of the six cent minimum to those contracts that expressly provide for it. This PPA never did. The contractual pricing provisions conveyed an intent to base the price for the 7.5 MW of "new" capacity during the second and third periods on NIMO's full avoided costs.

The parties' remaining contentions are without merit.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Chief Judge KAYE and Judges G.B. SMITH, ROSENBLATT and GRAFFEO concur; Judge READ taking no part.

Order affirmed, with costs.