### In re MEGAN–RACINE ASSOCIATES, INC., Debtor.

#### Bankruptcy No. 92–00860.

United States Bankruptcy Court, N.D. New York.

Feb. 2, 1996.

Menter, Rudin & Trivelpiece, P.C. (Jeffrey Dove, Mitchell Katz, of counsel), Syracuse, NY, for Debtor.

Swidler & Berlin, Chartered (William J. Mertens, Michael L. Shor, of counsel), Washington, DC, Brian Billinson, Niagara Mohawk Power Corporation, Law Department, Syracuse, NY, for Niagara Mohawk Power Corp.

House, Golden, Kingsmill & Riess (Marguerite K. Kingsmill, W. Richard House, of counsel), New Orleans, LA, Bond, Schoeneck & King, L.L.P. (James Dati, of counsel), Syracuse, NY, for Hudson Engineering.

Hodgson, Russ, Andrews, Woods & Goodyear (Deborah L. Kelly, of counsel), Albany, NY, Dewey Ballantine (Earle O'Donnell, of counsel), Washington, DC, Dewey Ballantine (Sandor E. Schick, of counsel), New York City, for Federal Deposit Insurance Corporation.

Hinman, Howard & Katell (Amy Shapiro, of counsel), Binghamton, NY, for Examiner.

Melvin & Melvin (Kenneth J. Bobrycki, of counsel), Syracuse, NY, for TransCanada Gas Marketing, Limited.

Hancock & Estabrook, L.L.P. (Stephen Donato, of counsel), Syracuse, NY, for Kraft.

Michael Collins, Assistant U.S. Trustee, Utica, NY.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

The within contested matters are before the Court by way of two motions filed by Niagara Mohawk Power Corporation ("NIMO"). NIMO's first motion seeks to terminate ("termination motion") payments it makes to Megan–Racine Associates, Inc. ("Debtor") pursuant to New York Public Service Law § 66–c(2) ("6¢ payments" or "PSL § 66–c(2)") for electrical power purchased from Debtor. NIMO filed its termination motion pursuant to this Court's December 19, 1995 Order shortening notice under Federal Rules of Bankruptcy Procedure ("Fed. R.Bankr.P.") 9006(c). NIMO seeks relief pursuant to § 362(d) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"), or alternatively, pursuant to Fed.R.Bankr.P. 9024 which incorporates by reference Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 60(b)(2), (5), and (6).

NIMO's second motion, brought before the Court pursuant to a December 28, 1995 Order shortening notice and Code §§ 363(e) and 105(a), seeks to pay into the registry of the Court, pending the Court's decision on the termination motion, the difference between the 6¢ payments and the payments due to Debtor under NIMO's Service Classification No. 6 ("SC–6 tariff") ("surplus amount"). NIMO's motions are opposed by Debtor, Federal Deposit Insurance Corporation ("FDIC"), as receiver for New Bank of New England, Hudson Engineering Corporation ("Hudson"), Kraft General Foods, Inc. ("Kraft") and TransCanada Gas Marketing Limited ("TransCanada").

Following two consensual adjournments, the Court heard oral argument on January 17, 1996 at a motion term held in Utica, New York.[1] The parties were thereafter afforded an opportunity to submit additional memoranda of law and the matter was submitted for decision on January 19, 1996.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and the subject matter of these contested matters pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), (b)(2)(A), (G), (K), and (O ).

## FACTS

Debtor was formed on March 31, 1987, for the purpose of developing and owning a cogeneration facility ("Facility").[2] The Facility, located at Canton, New York, is a gas fired, topping cycle cogeneration facility which purchases [3] and then burns natural gas in a gas generator. The energy given off as a result of the burning of the natural gas is used to create steam which is then converted to mechanical energy. The mechanical energy, in turn, is used to generate electrical power.[4] The Facility was designed with an initial annual capacity of approximately 48.3 megawatts, and an expected annual production of approximately 400,000 megawatt-hours.

On or about November 21, 1987, Debtor and NIMO entered into an agreement ("PPA") for the sale and purchase of electrical power produced at the Facility. On November 22, 1988, Debtor filed with the Federal Energy Regulatory Commission ("FERC") an Application for Commission Certification of Qualifying Status of a Cogeneration Facility pursuant to 18 C.F.R. § 292.207. On January 27, 1989, FERC issued an Order granting Debtor's application and thereby certified it as a federal qualifying facility ("QF").[5]

The PPA provides at Paragraph NINTH that "on or before the twenty-fifth (25th) day of each month ... NIAGARA will pay SELLER [Debtor] monthly for ELECTRICITY received from SELLER at the applicable rates contained in NIAGARA's Service Classification No. 6 of PSC No. 207 [SC–6 tariff] ..." [6] NIMO, however, does not pay Debtor at its tariff rate which is approximately $.02 per kilowatt hour ("kWh"). NIMO, instead, pays Debtor 6¢/kWh pursuant to PSL § 66–c(2).[7] The payments received from NIMO represent Debtor's primary source of revenue.

On March 17, 1992, Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. It has since operated as a debtor-in-possession pursuant to Code §§ 1107 and 1108.

1. The adjournments were at Debtor's request and were not opposed by NIMO.

2. As defined by federal law, a cogeneration facility is one which produces useful thermal energy (such as steam) in addition to electric power. *See Freehold Cogeneration, L.P. v. Bd. Reg. Com'rs of N.J.*, 44 F.3d 1178, 1182 n. 2 (3rd Cir.1995), *reh'g denied*, (citing 16 U.S.C. § 796(18)(A)).

3. On or about February 12, 1991, Debtor allegedly entered into a fuel supply contract with TransCanada (formerly called Western Gas Marketing Limited). On or about December 29, 1995 TransCanada filed a motion requesting, among other things, future gas payments out of FDIC's cash collateral pursuant to Code § 506(c). TransCanada's motion was also submitted for decision on January 19, 1996 and will be addressed in a separate Memorandum–Decision.

4. Debtor alleges that it also makes thermal sales to Kraft, although an agreement evidencing the same has not been submitted to the Court.

5. The term "federal qualifying facility" is not synonymous with the term "state qualifying facility" as some facilities may qualify as one but not the other. *See Con Edison v. Public Serv. Comm.*, 63 N.Y.2d 424, 432 n. 3, 483 N.Y.S.2d 153, 472 N.E.2d 981 (1984), *appeal dismissed*, 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985).

6. In the event that the SC–6 tariff rate is suspended or rescinded, the PPA provides a calculation for payment. *See* PPA at ¶ NINTH (referencing Attachment I).

7. The SC–6 tariff allegedly references PSL § 66–c. *See* January 8, 1996, FDIC Memorandum of Law at 4. As such, the PPA incorporates by reference PSL § 66–c. The PPA, then, is essentially a "greater of" pricing contract (i.e. NIMO must pay the greater of its SC–6 tariff rate or 6¢/kWh).

On or about August 1, 1994, NIMO commenced adversary proceeding 94–70113A ("adversary proceeding") against Debtor and FDIC. NIMO's Complaint essentially seeks a declaration that the PPA is null and void and seeks to recover damages because Debtor did not meet federal QF standards for calendar years 1991, 1992, 1993, and 1994. Issue was joined by the service of an Answer on behalf of Debtor on or about August 30, 1994, and by the service of an Answer with Counterclaims on behalf of FDIC on or about September 1, 1994. *See In re Megan–Racine Associates, Inc.,* 180 B.R. 375, 378–379 (Bankr.N.D.N.Y.1995) ("Summary Judgment Decision"). Pursuant to a Joint First Amended Pretrial Order dated January 6, 1995, the parties agreed to commence the trial of the adversary proceeding on March 30, 1995.

On or about February 24, 1995, NIMO filed a motion seeking to escrow ("escrow motion") the difference between the 6¢ payments and the payments due to Debtor under NIMO's SC–6 tariff rate. NIMO's escrow motion, which was brought in Debtor's bankruptcy case and not in the pending adversary proceeding, sought relief pursuant to Code §§ 363(e) and 105(a). Following NIMO's escrow motion, Debtor and FDIC filed summary judgment motions in the adversary proceeding on February 28, 1995, and March 15, 1995, respectively.

On March 24, 1995, the Court rendered a decision on the summary judgment motions. The Court stayed the adversary proceeding pending the resolution of certain discrete QF regulatory matters which were referred to FERC. *See generally id.* Thereafter, the Court by Memorandum–Decision, Findings of Fact, Conclusions of Law and Order dated April 19, 1995 ("Escrow Decision"), denied NIMO's escrow motion. *See In re Megan–Racine Associates, Inc.,* 192 B.R. 321 (Bankr. N.D.N.Y.1995), *appeal pending,* Case No. 95–CV–702 (N.D.N.Y.).

On or about April 21, 1995, NIMO filed an expedited motion and petition ("Decertification petition") with FERC seeking, *inter*

*alia,* a "declaration that the Plant [Facility] failed to meet applicable qualifying facility [QF] standards ... and ... the Plant's certification should be revoked for calendar years 1991, 1992, 1993, and 1994 ..." Decertification petition at 1–2. Shortly thereafter, on April 28, 1995, NIMO filed a notice of appeal from the Court's Escrow Decision pursuant to Fed.R.Bankr.P. 8001(a) and 8002.

On May 22, 1995, Debtor filed at FERC a timely motion to intervene and answer NIMO's Decertification petition. As alternate relief, Debtor requested FERC to grant it a temporary waiver from QF standards for calendar years 1991–1994. Thereafter, on or about October 27, 1995, Debtor also filed a motion at FERC for recertification as a QF ("Recertification motion").

During the pendency of the FERC proceedings, NIMO filed a motion in this Court on April 19, 1995 seeking relief from the Escrow Decision pursuant to Fed.R.Civ.P. 60(b)(2) and (6) ("Rule 60(b) motion"). The Court, by Memorandum–Decision, Findings of Fact, Conclusions of Law and Order dated August 31, 1995 ("Rule 60(b) Decision"), denied the motion. *See In re Megan–Racine Associates, Inc.,* Case No. 92–00860, slip op., (Bankr.N.D.N.Y. August 31, 1995), *appeal pending,* Case No. 95–CV–1415 (N.D.N.Y.). NIMO subsequently filed a notice of appeal from the Court's Rule 60(b) Decision pursuant to Fed.R.Bankr.P. 8001(a) and 8002. NIMO's appeals from the Escrow Decision and the Rule 60(b) Decision were consolidated and are currently pending before the Honorable Con. G. Cholakis of the United States District Court of the Northern District of New York.

On December 14, 1995, FERC issued an order ("December 14 FERC order") finding that the Facility did not operate as a federal QF for calendar years 1991–1994.[8] *See Megan–Racine Associates, Inc.,* 73 FERC ¶ 61,-308 (1995). FERC also denied Debtor's request for a limited waiver of the federal QF standards and directed Debtor to show cause why FERC should not find that Debtor was a public utility within the meaning of the

---

**8.** Specifically, the December 14 FERC order determined that Debtor did not meet federal operating and efficiency standards for 1991 and 1992,

and did not meet the efficiency standard for calendar years 1993 and 1994.

Federal Power Act for the period of QF noncompliance. *Id.* FERC reserved for a separate order the disposition of Debtor's Recertification motion. *Id.*

On December 19, 1995, NIMO filed its termination motion. Thereafter, on or about December 22, 1995, NIMO, rather than paying the Debtor, paid the sum of $1,496,966.31 into its counsel's escrow account.[9] The escrowed proceeds represent the surplus amount for the electrical power sold by Debtor to NIMO in November 1995.[10] The parties opposing NIMO argue that escrowing the surplus amount was an intentional violation of the automatic stay and request sanctions.

On January 19, 1996, FERC issued an order ("January 19 FERC order") granting Debtor's Recertification motion. *See In re Megan–Racine Associates, Inc.,* 74 FERC ¶ 61,032 (1996). The January 19 FERC order found that "if the Megan–Racine facility operates as described in the application, it will meet, for calendar year 1995 and thereafter, all of the requirements for a qualifying cogeneration facility . . ." *Id.*

## DISCUSSION

■ The instant dispute is a matter of first impression which requires, among other things, the Court to determine whether Debtor is prospectively eligible for payments pursuant to PSL § 66–c(2). As the instant dispute calls for reading and analysis of a state statute, this Court is an appropriate forum and will apply the law of New York. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The Court further notes that an interpretation of this statutory section does not require the specialized knowledge of an administrative agency, namely, the New York Public Service Commission ("PSC"). *See e.g. Occidental v. Public Serv.,* 114 A.D.2d 149, 153–154, 499 N.Y.S.2d 214 (N.Y.A.D. 3 Dept.1986), *appeal denied,* 498 N.E.2d 435, 68 N.Y.2d 608, 506 N.Y.S.2d 1033 (1986); *compare* Summary

Judgment Decision, *supra,* 180 B.R. at 380–383 (referring regulatory matters requiring administrative expertise to FERC).

■ The District Court for the Western District of New York appropriately noted in a recent decision that, "An understanding of the facts of this case requires some explanation of the statutes and regulations that control the relationship between a private producer such as [Debtor] and a public utility corporation such as [NIMO]." *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Electric Corp.,* 908 F.Supp. 1180, 1182 (W.D.N.Y. 1995). Congress enacted the Public Utility Regulatory Policies Act of 1978 ("PURPA") in an effort to combat the energy crisis of the 1970s. 16 U.S.C. § 823a *et seq.; see FERC v. Mississippi,* 456 U.S. 742, 746, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532 (1982); *Freehold Cogeneration, L.P. v. Bd. Reg. Com'rs of N.J., supra,* 44 F.3d at 1182. One of the purposes of PURPA was to lessen the dependence of electric utilities on foreign oil and on natural gas by encouraging the development of alternative power sources in the form of cogeneration and small power production facilities. *See Liquid Carbonic Industries Corp. v. FERC,* 29 F.3d 697, 699 (D.C.Cir. 1994).

In furtherance of its objectives, Congress directed FERC to promulgate rules and regulations requiring public utilities to buy electric energy from, and to sell electric energy to, qualifying cogeneration facilities. *See Freehold Cogeneration, L.P. v. Bd. Reg. Com'rs of N.J., supra,* 44 F.3d at 1182 (citing 16 U.S.C. § 824a–3). Facilities that meet the federal QF standards that FERC promulgates also enjoy the benefit of being exempt from certain state and federal regulations, including the Federal Power Act ("FPA"). *See Liquid Carbonic Industries Corp. v. FERC, supra,* 29 F.3d at 699; *Con Edison v. Public Serv. Comm., supra,* 63 N.Y.2d at 432, 483 N.Y.S.2d 153, 472 N.E.2d 981.

Congress directed state regulatory authorities, because of their expertise and unique

---

**9.** NIMO's counsel is Swidler & Berlin, Chartered.

**10.** Presumably NIMO also escrowed the surplus amount due for the electrical power sold by

Debtor in December 1995 as that payment was due on January 25, 1996 pursuant to Paragraph NINTH of the PPA.

knowledge of local conditions, to implement FERC's rules and regulations. *See Kamine/Besicorp Allegany L.P. v. Rochester Gas & Electric Corp.,* *supra,* at 1182; *Freehold Cogeneration, L.P. v. Bd. Reg. Com'rs of N.J.,* *supra,* 44 F.3d at 1182, 1191. As such, in 1980 New York passed the Public Service Law, a so called mini-PURPA. *See Con Edison v. Public Serv. Comm.,* *supra,* 63 N.Y.2d at 432, 483 N.Y.S.2d 153, 472 N.E.2d 981. The state statute differed from PURPA [11] in that it had a minimum purchase price of 6¢/kWh for electricity purchased by a utility from a state qualifying facility ("6¢ Law"). *Id.*

The constitutional validity of the 6¢ Law was challenged in 1984. The New York Court of Appeals, in reversing the trial court, held that PURPA did not preempt the 6¢ Law to the extent that it requires electric utilities to purchase power from *federal* QFs at a rate in excess of avoided cost. *Id.* at 433, 438, 483 N.Y.S.2d 153, 472 N.E.2d 981. The *Con Edison* decision also held that the FPA preempted the PSC from compelling utilities to offer to purchase power from facilities that were only *state* qualifying facilities. *Id.* at 438, 483 N.Y.S.2d 153, 472 N.E.2d 981. The United States Supreme Court dismissed, for want of a substantial federal question, an appeal from the *Con Edison* decision. *See Con Edison v. Public Serv. Comm.,* *supra,* 470 U.S. at 1075, 105 S.Ct. at 1831; *compare Orange and Rockland Utilities Inc.,* 43 FERC ¶ 61,067, *reh'g. denied,* 43 FERC ¶ 61,546 (1988) (FERC objected to New York's 6¢ Law on wholesale purchases in interstate commerce because of overwhelming QF development).[12]

In 1992 New York amended its mini-PURPA statute by repealing the 6¢/kWh minimum purchase price and adding a so called "grandfathering" provision, PSL § 66–c(2). PSL § 66–c(2) provides in relevant part:

Notwithstanding any other provision of law, the minimum sales price for purchased electricity from any alternate energy production facility, co-generation facility or small hydro facility of six cents per kilowatt hour for each utility ... shall remain in full force and effect (a) for any contract fully executed by the parties and filed with the commission [PSC] on or before June twenty-sixth, nineteen hundred ninety-two and (i) providing for the purchase of electricity at such minimum sales price, or (ii) providing for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price ... for the duration of any such contract and subject to the terms and conditions of such contract and performance thereunder, provided, however, that such minimum sales price shall be implemented in accordance with the policies and conditions established by the commission ...

█ The parties do not dispute that Debtor has a contract for the sale and purchase of electrical power, namely, the PPA, which was fully executed prior to June 26, 1992. The parties also agree that pursuant to the New York Court of Appeals' *Con Edison* decision, cogenerators that do not meet federal QF standards and are otherwise not exempt from the FPA are not entitled to 6¢ payments. NIMO argues that the December 14 FERC order determined, among other things, that Debtor did not meet federal QF standards for 1991 and 1992. As such, pursuant to the *Con Edison* decision Debtor was not entitled to 6¢ payments prior to the repeal of the 6¢ Law. NIMO argues that the grandfathering provision explicitly provides that the 6¢ payments "shall *remain* in full force and effect" for certain facilities. NIMO concludes that because Debtor was not eligible for the 6¢ payments prior to the repeal, the 6¢ payments could not possibly "*remain*

---

11. PURPA places a ceiling on the purchase rate by providing that FERC may not establish a rate that exceeds the purchasing utility's "avoided cost." *See* 16 U.S.C. § 824a–3[b]. A utility's "avoided cost" is the amount that it would have cost the utility to generate the same energy that it bought from the qualifying cogenerator had that purchase not been made. *See* 16 U.S.C. § 824a–3[d].

12. Because almost all generated electricity enters an interstate transmission grid and thus can be considered interstate commerce, the FERC ruling also arguably applies to rates imposed on utilities that operate exclusively in one state.

in full force and effect." Therefore, Debtor's failure to meet federal QF standards prior to June 26, 1992, rendered Debtor ineligible to be grandfathered under PSL § 66–c(2).[13]

■ FERC's determination that Debtor did not meet federal QF standards for calendar years 1991–1994 is a final order for purposes of the motions presently before the Court and the pending adversary proceeding. FERC's procedural rules explicitly state that "orders are effective on the date of issuance." 18 C.F.R. § 385.2007(c). FERC's orders remain effective even if a party seeks an administrative rehearing or judicial review. *See* 18 C.F.R. § 385.713(e).

In addition, the Court specifically stated in its Summary Judgment Decision that the stay of the adversary proceeding would "terminate following *FERC's* final resolution of the discrete QF issues ..." *See* Summary Judgment Decision, *supra*, 180 B.R. at 384 (emphasis added). The Court did not contemplate a stay of all matters involving QF issues until a *last, unappealable* decision was rendered. *Id.* (Court specifically requested FERC to resolve QF issues "as expeditiously as possible ... [because] it would be a great injustice for this case to languish ..."); *see also* Escrow Decision at 16–17; Rule 60(b) Decision at 10; *compare Connecticut Light & Power Co. v. S.E. Conn. R.R.R.A.,* 822 F.Supp. 888, 892 (D.Conn.1993) (court, relying on the doctrine of primary jurisdiction, referred matters to FERC and specifically provided that, "All further proceedings in this matter are STAYED pending final determination by FERC of the Petition, *including any appeals* taken from that Petition." (emphasis added)).

Having concluded that Debtor did not meet federal QF standards for 1991–1994, the Court turns its attention to PSL § 66–c(2). Under New York law the core principle for judicial interpretation of statutes is that courts must interpret a statute to effectuate the legislature's intent. *See* New York Statutes § 91 (McKinney 1996) (citations omitted). The primary source for the determination of intent is the language of the statute itself. *Id.* at § 76, § 92.

The plain language of PSL § 66–c(2) reveals that the intent of the legislature was to grandfather, among others, those cogenerators that had a *contract* providing for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price and such *contract* was executed prior to June 26, 1992. *See In re United Supply of America,* 1993 WL 104489, *4 (Case 92–E–0790 N.Y.P.S.C.) (PSC determined that cogenerator was not entitled to grandfathering provision because contract was not executed and filed with PSC prior to June 26, 1992). The statutory section does not provide that the cogenerator also had to be a federal QF prior to June 26, 1992. To read such a provision into PSL § 66–c(2) would require result-oriented adjudication far removed from what the actual intent of the legislature was.

Furthermore, the power purchase contract is arguably the linchpin for the development of a cogeneration facility. For example, negotiating the power purchase agreement is often the first step in the development process. Project financers, constructors, and others rely on the power purchase contract and its specified pricing term or terms as this contract is the primary source of revenue for the facility. Thus, in an effort to protect those relying on the anticipated revenue to be generated pursuant to the contract, the legislature offered "reasonable grandfathering for those facilities already incorporating such a provision [6¢ payments] within contracts approved by the Public Service Commission [PSC]." *See* New York State Legislative Annual (1992), Governor's Program Bill Memorandum Ch. 519.[14] As such, PSL § 66–c(2) was enacted in order to provide reasonable protection to those "who relied on this minimum price provision," *id.,* while repealing the statutory minimum 6¢/kWh sales price "with respect to *future con-*

---

13. NIMO's counsel, William Mertens, Esq., stated at oral argument that NIMO does not concede that the Facility was a cogenerator under state law. NIMO, however, did not offer any evidence supporting the claim that the Facility was not a cogenerator as defined by state law.

14. Memoranda submitted to the Legislature and to the Governor may be used as an aid in statutory interpretation. *See* New York Statutes § 125.

*tracts.*" *Id.* Governor's Approval Memorandum Ch. 519 (emphasis added).

The Court is cognizant of the statutory rule of construction that a legislature is presumed to have knowledge of other laws in effect and of relevant case law when amending a statute. *See* New York Statutes § 191 (citations omitted). NIMO, presumably relying on such a rule of construction, argues that the New York Court of Appeals' *Con Edison* decision, when read with the express statutory language of PSL § 66–c(2), leads to the conclusion that a cogenerator must have a contract executed prior to June 26, 1992 *and* have met federal QF standards prior to that date in order to be grandfathered from the repeal of the 6¢ Law.

The Court cannot agree with NIMO's conclusion. The grandfathering provision intended to preserve any rights that had accrued prior to June 26, 1992. The right to payments pursuant to the 6¢ Law accrued if a facility was "developed on or after June twenty-six, nineteen hundred, eighty ..." PSL § 66–c(1) (repealed 1992). The *Con Edison* decision determined that a facility which did not meet federal QF standards was not currently entitled to 6¢ payments, not that it was *never* entitled to those payments. Construing the *Con Edison* decision within the state and federal statutory framework, the Court concludes that the Court of Appeals' decision merely suspended 6¢ payments during a period of federal QF noncompliance but did not revoke a right which had already accrued. Thus, the *Con Edison* decision cannot be construed as a judicially created addition to PSL § 66–c(2).

As Debtor did not meet federal QF standards for calendar years 1991–1994, its entitlement to 6¢ payments was suspended and the appropriate rates for those years will be determined by FERC. *See Megan–Racine Associates, Inc., supra,* 73 FERC ¶ 61,308 (requiring Debtor to show cause why FERC should not find that it was a public utility within the FPA). However, because the January 19 FERC order recertified Debtor as a federal QF for 1995 and thereafter, *see In re Megan–Racine Associates, Inc., supra,* 74 FERC ¶ 61,032, Debtor is entitled to the escrowed surplus amount and prospective 6¢

payments subject to the disposition of the adversary proceeding. Therefore, NIMO's termination motion is denied.

■ NIMO's motion to pay into the Court registry the surplus amount pursuant to Code §§ 363(e) and 105(a) is also denied. NIMO has failed to establish the validity priority or extent of its interest as required by Code § 363(*o*). As the Court noted in its Escrow Decision, "NIMO's interest in the alleged overpayments is contingent on a factual finding that Debtor was not a QF prior to 1992. NIMO's interest is *also* contingent on a finding that Debtor was not entitled to be grandfathered from the repeal of the 6¢ rate." Escrow Decision at 10–17 (emphasis added).

■ The Court must now determine whether NIMO, by unilaterally escrowing the surplus amount on or about December 22, 1995 and presumably on January 25, 1996, violated the automatic stay imposed by Code § 362(a). NIMO argues that under the Supreme Court's recent decision, *Citizens Bank of Maryland v. Strumpf,* —— U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), its conduct did not violate the terms of Code § 362(a)(3).

In *Strumpf,* the debtor maintained a checking account with Citizens Bank of Maryland. *Id.* at ——, 116 S.Ct. at 288. The debtor was also in default of a loan from the bank with an outstanding balance of $5,068.75. *Id.* After the debtor filed for relief under Chapter 13 of the Bankruptcy Code, Citizens Bank of Maryland placed an administrative freeze on the debtor's checking account. *Id.* Thereafter, the bank filed a "Motion for Relief from Automatic Stay and for Setoff." *Id.*

The narrow issue confronting the Supreme Court was "... whether the creditor of a debtor in bankruptcy may, *in order to protect its setoff rights,* temporarily withhold payment of a debt ..." *Id.* (emphasis added). The court held that the administrative freeze of the debtor's account did not violate Code § 362(a)(7). The Court reasoned that denying the bank the right to place an administrative hold on the checking account would eviscerate exercise of the bank's right to setoff

expressly preserved by Code §§ 542(b) and 553. Such an interpretation of the Bankruptcy Code was impermissible as, "it is an elementary rule of construction that 'the act cannot be held to destroy itself.' " *Id.* at ——, 116 S.Ct. at 290 (quoting *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 446, 27 S.Ct. 350, 358, 51 L.Ed. 553 (1907)).

The court also held that the temporary administrative freeze did not violate Code §§ 362(a)(3) and (a)(6).[15] The Court stated that the debtor's reliance on these statutory provisions was misplaced because of the "false premise that [bank's] administrative hold took something from the [debtor], or exercised dominion over property that belonged to [debtor]." *Id.* The court reasoned that the relationship between bank and depositor is essentially founded upon contract and, as such, the temporary freeze amounted to merely a refusal to honor a contractual promise. *Id.* (citing *Bank of Marin v. England,* 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966) ("The relationship of bank and depositor is that of debtor and creditor, founded upon contract.")). The court then relied on its trump card and stated that, *"In any event,* we will not give §§ 362(a)(3) or (6) an interpretation that would proscribe what § 542(b)'s 'exception' and § 553(a)'s general rule were intended to permit ..." *Id.* (emphasis added).

■ It is a fundamental axiom of bankruptcy law that the automatic stay is pervasive and exemptions from the stay are strictly construed. The logic of the foregoing compels a narrow reading of *Strumpf.* In addition, the language of the decision itself dictates that its holding is limited to the so called "banker's dilemma" of preserving a creditor's set off rights.

NIMO's reliance on *Strumpf* is misplaced because NIMO, unlike the Citizens Bank of Maryland, is not seeking to preserve the set off rights provided by Code §§ 542(b) and 553. NIMO expressly states that it "does not base its claim to the escrowed funds on some other offsetting obligation that MRA [Debtor] owes to Niagara Mohawk, but on MRA's complete lack of entitlement." Memorandum of NIMO on *Citizens Bank of Maryland v. Strumpf* at 6. Another distinguishing fact is that the debtor in *Strumpf* did not dispute its obligation to the bank. In contrast, the parties in the matter *sub judice* vigorously dispute what their mutual obligations are under the PPA.

NIMO essentially argues that the *Strumpf* court recognized that the relationship between a bank and depositor is predicated on a contract. As such, the Supreme Court determined that the bank's administrative freeze was merely "a refusal to perform its promise" under the contract and was neither a taking of possession of the debtor's property nor an exercise of control over it. NIMO argues that escrowing the surplus amount was also, at most, a temporary refusal to perform a contractual promise.

■ NIMO glosses over the fact that unlike in *Strumpf,* the contract in this case is an *executory* contract as both Debtor and NIMO have significant, unperformed obligations remaining under the PPA. *See Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency,* 155 B.R. 824, 843 (Bankr. N.D.N.Y.1993) ("To be considered executory, the performance remaining due [on both sides] must be significant."). This Court follows the long line of cases adopting the so-called "inclusionary doctrine" and concludes that an executory contract is property of the estate upon the filing of the petition.[16] *See In re Kings Falls Power Corp.,* 185 B.R. 431, 438 (Bankr.N.D.N.Y.1995) (creditor erroneously concluded that unassumed contract did not constitute property of the estate); *In re Albion Disposal, Inc.,* 152 B.R. 794, 806–808 (Bankr.W.D.N.Y.1993); *Alert Holdings, Inc. v. Interstate Protective Services, Inc.,* 148 B.R. 194, 203 (Bankr.S.D.N.Y.1992) ("an executory contract is property of the estate");

---

**15.** Code § 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Code § 362(a)(6) prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title."

**16.** Whether the PPA is assumable is, of course, disputed.

*In re Computer Communications,* 824 F.2d 725 (9th Cir.1987)[17]; Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn.L.Rev. 227, 324–325 (1989); 2 W. Norton, Norton Bankruptcy Law and Practice 2d, § 39:8, 39–32 ("The better view is that executory contracts and unexpired leases become property of the estate.").

As noted above, the scope of Code § 362 is broadly construed. "All proceedings are stayed, including arbitration, license revocation, administrative and judicial proceedings. Proceeding in this sense encompasses civil actions as well, and all proceedings even if they are not before governmental tribunals." H.R.Rep. No. 595, 95th Cong., 2d Sess. 340 (1978), U.S. Code Cong. & Admin. News 5963, 6297. In addition, the Second Circuit has noted that, "Nothing in the Code suggests that a party is entitled to engage in 'self-help' in derogation of the automatic stay." *In re Fugazy Exp., Inc.,* 982 F.2d 769, 776 (2d Cir.1992) (citing *In re Computer Communications, Inc., supra,* 824 F.2d 725).

In the case at bar, NIMO unilaterally determined that Debtor was not entitled to prospective 6¢ payments pursuant to PSL § 66–c which is incorporated by reference in the PPA. *See supra* note 7. NIMO engaged in self-help by escrowing the surplus amount and, thereafter, came to this Court for pro hac justification. Although Congress expressly exempted certain actions from the automatic stay, none of the exceptions can be interpreted to embrace unilateral actions that affect executory contracts governed by the provisions of Code § 365. *See Matter of Pester Refining Co.,* 58 B.R. 189, 191–192 (Bankr.S.D.Iowa 1985) (creditor was barred by Code § 362(a) from enforcing a contractual provision of unassumed executory contract) (citing *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984)); *In re Computer Communications, Inc., supra,* 824 F.2d at 728–731 (holding that even if executory contract was terminable under Code § 365(e)(2), Code § 362(a)(3) automatically stayed termination). This is particularly true where, as in this case, a debtor's executory contract is its primary asset. The Court concludes that NIMO's actions impacted upon property of the estate, namely, the PPA, and were therefore in derogation of Code § 362(a)(3).

The law in this Circuit is clear that sanctions for violations of the automatic stay pursuant to Code § 362(h) are only appropriate as to debtors who are natural persons. *See In re Chateaugay Corp.,* 920 F.2d 183, 186–187 (2d Cir.1990). "For other debtors, contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay." *Id.* at 187. Thus, where the debtor is a corporation, as in the instant case, sanctions can be imposed only on a showing of maliciousness or lack of a good faith argument and belief that the party's actions were not in violation of the stay. *See In re Crysen/Montenay Energy Co.,* 902 F.2d 1098, 1104 (2d Cir. 1990). Although NIMO should have sought relief from the stay pursuant to Code § 362(d) or (f) prior to unilaterally escrowing the surplus amount, the applicability of the automatic stay was sufficiently unsettled following the Supreme Court's decision in *Strumpf* that the Court declines, in its discretion, to impose sanctions against NIMO.

Accordingly, it is hereby

ORDERED that NIMO's motion made pursuant to Code § 362(d), or alternatively, Fed.R.Civ.P. 60(b)(3), (5) and (6) to terminate 6¢ payments is denied; it is further

ORDERED that NIMO's motion made pursuant to Code §§ 363(e) and 105(a) to pay into the registry of the Court the surplus amount is denied; it is further

ORDERED that NIMO turnover to Debtor all escrowed funds, interest and fees as prescribed by the PPA within ten (10) days of entry of this Order; it is further

ORDERED that sanctions will not be imposed on NIMO for its violation of the automatic stay.

---

**17.** The Ninth Circuit has also held that an executory contract is not an asset of the estate until it is assumed. *See In re Qintex Entertainment, Inc.,* 950 F.2d 1492, 1495 (9th Cir.1991).