OAKES, Senior Circuit Judge:
This appeal raises a simple issue of statutory interpretation, but is set in a complex factual and legal background. The Federal Deposit Insurance Corporation (“FDIC”), Megan-Racine Associates, Inc. (“Megan”), and Hudson Engineering Corp. (“Hudson”) appeal a Memorandum-Decision and Order of the United States District Court for the Northern District of New York, Rosemary S. Pooler, Judge, dated July 12, 1996, which reversed a decision of the United States Bankruptcy Court for the Northern District of New York, Stephen D. Gerling, Chief Bankruptcy Judge, and a judgment entered on July 16, 1996. All three appeals concern the construction to be given to a grandfather provision that was part of a 1992 amendment to New York’s Public Service Law § 66-c. Megan and the FDIC advance substantially the same arguments about the construction of the statute, while Hudson raises questions concerning the jurisdiction of and standard of review applied by the district court. We agree with the bankruptcy court’s construction and therefore reverse.

Background.

The appeals arise from a bankruptcy proceeding in which Niagara Mohawk Power Corporation (“Niagara”) seeks to limit the amount it owes under a Power Purchase Agreement (“PPA”) between Niagara and debtor Megan, the developer and owner of a power generation facility located in Canton, New York. A fire and explosion on May 2, 1996, destroyed parts of the facility and halted its operation; the decision as to whether to rebuild the plant has been delayed in anticipation of our resolution of this expedited appeal. When it was operational, the facility burned natural gas to generate steam, some of which was transformed into electrical power and sold to Niagara under the terms of the PPA. Federal law classifies such facilities as co-generators, and they receive special regulatory benefits.
Niagara is of course a public utility which' generates and distributes electricity in upstate New York, subject to the jurisdiction of the New York Public Service Commission (“PSC”) and the Federal Energy Regulation Commission (“FERC”). Pursuant to the Public Utility Regulatory Policies Act of 1978 (“PURPA”), Niagara is required to purchase power from facilities like Megan’s.
*673 Hudson is the design contractor for the Canton facility, and the chairman of the Unsecured Creditors Committee in the Chapter 11 proceeding currently before the bankruptcy court. The FDIC, as Receiver for New Bank of New England, N.A., (“NBNE”) is the holder of a note, mortgage, and security interest granted by Megan to the bank in connection with a loan of $47 million which financed the development of the facility.
PURPA was enacted by Congress as part of an initiative to promote independent power generation, and thus to reduce this country’s dependence on foreign oil. See FERC v. Mississippi, 456 U.S. 742, 750, 102 S.Ct. 2126, 2132, 72 L.Ed.2d 532 (1982). To this end, Title II of PURPA required electric utilities to buy electricity from co-generators and small producers at rates as high as the utility’s “avoided cost.” See 16 U.S.C. § 824a-3(b) (West, WESTLAW through 1996) (“No such rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electrical utility of alternative electrical energy.”). The FERC is charged with implementing PURPA and promulgating regulations thereunder, including the operating and efficiency standards a power generator must meet to be a qualified facility (“QF”). 16 U.S.C. § 824a-3 (a); 18 C.F.R § 292.101(b)(1) (1996). PURPA also authorized the FERC to exempt QFs from certain burdensome regulations, including provisions of the Federal Power Act (FPA). 16 U.S.C. § 824a-3(e)(l); 18 C.F.R. § 292.601.
In 1981, New York amended its Public Service Law § 66-c with a provision similar to PURPA’s, but which went further than PURPA in a key respect: the new New York law required utilities to enter into contracts to purchase power from qualified facilities at the higher of six cents per kilowatt hour or of the utility’s avoided cost.[1] The new law created a dispute over the proper scope of state authority in the cooperative system established by PURPA[2]
In October of 1984, the Court of Appeals of New York delineated what it believed to be the proper limits of New York’s authority under PURPA and the FPA. Consolidated Edison Co. v. Public Service Comm’n, 63 N.Y.2d 424, 483 N.Y.S.2d 153, 472 N.E.2d 981 (1984), appeal dismissed, 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985) (“ConEd ”). The decision held that a facility must be a federal QF to qualify for PURPA’s exemptions to the FPA, and that states could set a minimum price of electricity purchased from a QF above the avoided-cost cap PURPA put on the FERC. This appeal implicates the first of the holdings. The court reasoned that “[t]he FPA would ... *674 preempt State regulation of the Federal qualifying facilities in New York, except that they are exempted from the FPA under subdivision (e) of section 210 of PURPA.” ConEd, 63 N.Y.2d at 438-39, 483 N.Y.S.2d 153, 472 N.E.2d 981. Facilities which qualify only under state law, by contrast, are “not eligible for this Federally authorized exemption because they are not covered by PURPA.” Id. at 439, 483 N.Y.S.2d 153, 472 N.E.2d 981. States therefore could not require purchases on favorable terms from non-QFs.
In 1992, New York amended its Public Service Law to eliminate the mandatory six-cent rate. The amendment also included the following grandfathering language:
Notwithstanding any other provision of law, the minimum sales price for purchased electricity from any alternative energy production facility, co-generation facility or small hydro facility of six cents per kilowatt hour for each utility, as established by chapter eight hundred forty-three of the laws of nineteen hundred eighty-one, shall remain in full force and effect (a) for any contract fully executed by the parties and filed with the commission on or before June twenty-sixth, nineteen hundred ninety-two and (i) providing for the purchase of electricity at such minimum sales price, or (ii) providing for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price ... for the duration of any such contract and subject to the terms and conditions of such contract and performance thereunder....
N.Y.Pub.Serv. Law § 66-c(2) (McKinney Supp.1995). This language is the focus of the present dispute.

Facts.

In November 1987, Niagara and Megan executed the PPA, which was filed with the PSC in 1988. The contract required Niagara to pay for electricity received from Megan at a utility tariff rate referencing the six-cent price set by state law. Niagara’s current avoided cost, by comparison, is substantially less than six cents a kilowatt hour. The PPA also required Megan to certify that its facility qualified under federal standards.
The FERC, based on the preliminary plans for the facility, issued an order certifying Megan as a QF. Megan-Racine Associates, Inc., 46 FERC ¶ 62,074, 1989 WL 260472 (F.E.R.C. Jan. 27, 1989). NBNE responded with its loan, and construction began. The facility began producing electricity in 1991, but its future was not bright. Testing revealed that the plant did not conform to standards required by the construction contract, and a dispute ensued. Hudson was ejected from the operation of the facility, and Megan sought to retain replacement engineers to complete the plant.
On March 17, 1992, Megan filed for bankruptcy under Chapter 11. In June, because of continuing operational problems, the bankruptcy court appointed an examiner to operate the ill-fated facility. More than two years later, on August 1,1994, Niagara intervened in the bankruptcy proceeding by commencing an adversary proceeding seeking to terminate the PPA because the plant’s operational and efficiency deficiencies prevented the project from being a QF. Niagara, on February 24,1995, made a motion seeking to pay into an escrow account the disputed portion of the payments due Megan under the six-cent law. Megan responded with a motion for summary judgment, or for a stay of the adversary proceeding. The bankruptcy court denied summary judgment, without prejudice, stayed the adversary proceeding, and referred the technical question of Megan’s QF status to the FERC. In re Megan-Racine Associates, Inc., 180 B.R. 375, 383 (Bankr.N.D.N.Y.1995). Niagara’s escrow motion was denied in In re Megan-Racine Assocs., Inc., 192 B.R. 321 (Bankr.N.D.N.Y.1995).
Niagara promptly filed a decertification petition with the FERC. On December 14, 1995, the FERC issued a decision finding that Megan was not able to demonstrate that the facility operated as a QF during calendar years 1991 to 1994. Megan-Racine Assocs., Inc., 73 FERC ¶ 61, 308, 1995 WL 902447 (F.E.R.C Dec. 14, 1995) (decertification decision) (Megan failed to prove that the facility satisfied operation and efficiency standards *675 for 1991 and 1992 or the efficiency standards for 1993 and 1994). The FERC also denied a separate application by Megan for a waiver of the QF requirements. And, on January 19, .1996, the FERC granted Megan’s application for recertification for 1995 and thereafter, on the condition that the facility operate as represented. Megan-Racine Assocs., Inc., 74 FERC ¶ 61,032, 1996 WL 19663 (F.E.R.C. Jan. 19, 1996) (recertification decision).[3]
Immediately following the FERC’s decerti-fication decision, Niagara renewed its motion to terminate payment at the six-cent rate.[4] Before the hearing on its motion, Niagara began depositing into its attorney’s escrow account the difference between the statutory rate and a lower rate that the utility paid for electricity from other sources. Niagara then made a second motion, pursuant to 11 U.S.C. §§ 363(e) and 105(a), requesting permission to pay into the registry of the bankruptcy court the “excess subsidies” due Megan, on the grounds that Megan was not entitled to them and that provisional relief was needed to preserve the funds for appropriate distribution.
On February 2,1996, the bankruptcy court denied Niagara’s motion to terminate payment at the six-cent rate, denied its court registry motion, and directed Niagara to pay to Megan the escrowed funds plus interest and fees. In re Megan-Racine Assocs., Inc., 203 B.R. 873 (Bankr.N.D.N.Y.1996). In reaching its decision, the court considered, and rejected, subject to a future decision in the adversary proceeding on the breach of contract question, Niagara’s argument that Megan, having failed to operate as a QF, lost for perpetuity its entitlement to the six-cent rate. Niagara then sought a stay pending appeal of the bankruptcy court order, which was also denied.
On February 7, Niagara appealed to the district court where it was to have better luck. Niagara obtained the stay previously denied by the bankruptcy court. In re Megan-Racine Assocs., Inc., 1996 WL 167681 (N.D.N.Y. April 1, 1996). Niagara pressed its disagreement with the bankruptcy court’s determination that Megan’s failure to obtain QF status during its troubled start-up period did not affect, under New York’s grandfathering law, its future right to the six-cent rate should it later meet federal qualifications. In support of its position, Niagara argued that § 66-c(2) must be read in the light of the New York Court of Appeals’ decision in ConEd.
On July 12, the district court held in favor of Niagara. In re Megan-Racine Assocs., Inc., 198 B.R. 650 (N.D.N.Y.1996). The FDIC, Megan, and Hudson appeal this decision. Because we agree with the appellants that the bankruptcy court’s interpretation of the statute was correct, we reverse the district court and remand the matter to the bankruptcy court.

Jurisdiction and standard of review.

The single, narrow issue raised in this appeal is the proper interpretation of the grandfather provision in revised Public Service Law § 66-c(2). The question was raised by Niagara’s motion pursuant to 11 U.S.C. § 362(d) for relief from the automatic stay imposed in bankruptcy proceedings, and was decided in favor of Megan in the bankruptcy court’s decision of February 2, 1996. In this circuit, denial of relief from an automatic stay is a final order. In re Sonnax Industries, Inc., 907 F.2d 1280, 1284-85 (2d Cir.1990); In re Taddeo, 685 F.2d 24, 26 n. 4 (2d Cir.1982). We have jurisdiction under 28 U.S.C. § 158(d), and the district court had jurisdiction under 28 U.S.C. § 158(a). The district court applied its independent judgment when reviewing the bankruptcy court order, because the only contested matter was a question of law. See In re Lionel Corp., 29 F.3d 88, 92 (2d Cir.1994). Hudson argues that a denial of relief from an automatic stay *676 should be reviewed for abuse of discretion, even where the only question on appeal concerns statutory construction. Because we are fully in accord with the bankruptcy court’s interpretation of the law, it is not necessary for us to engage in speculation about the degree of deference to which it is entitled.

Discussion.

We are instructed by New York law to interpret statutes so as to effectuate the legislature’s intent. See New York Statutes § 92 (McKinney 1971 & Supp.1994). The most important evidence of legislative purpose is the language of the statute itself. Courts are not to look beyond the language of the statute, unless that language is unclear or ambiguous with respect to the facts of a particular case. Id. at §§ 76, 92.
For convenience, we repeat the provision at the center of this controversy:
Notwithstanding any other provision of law, the minimum sales price for purchased electricity from any alternative energy production facility, co-generation facility or small hydro facility of six cents per kilowatt hour for each utility, as established by chapter eight hundred forty-three of the laws of nineteen hundred eighty-one, shall remain in full force and effect (a) for any contract fully executed by the parties and filed with the commission on or before June twenty-sixth, nineteen hundred ninety-two and (i) providing for the purchase of electricity at such minimum sales price, or (ii) providing for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price ... for the duration of any such contract and subject to the terms and conditions of such contract and performance thereunder....
N.YJPub.Serv. Law § 66-c(2) (McKinney Supp.1996).
It clearly reaches “contract[s] fully executed by the parties and filed with the commission on or before June twenty-sixth, nineteen hundred ninety-two_” There is no disagreement that Niagara and Megan executed such a contract and that it was filed with the PSC in 1988. The section does not refer to federal qualification, much less make it a condition of grandfathering.
Niagara would have us attribute undue significance to the words “established” and “shall remain in full force and effect,” which are not drawn from the crucial clause defining the scope of the grandfather provision. Niagara would read “established” to require a facility to have achieved compliance with federal regulations. “Established” refers to the source of the old law, and it is simply not credible that the legislature meant for the word to carry the weight Niagara suggests. Further, because the predicate “shall remain in full force and effect” has “the minimum sales price for purchased electricity” as its subject, we think that it was intended to refer to the statutory price generally, and not to the entitlement of specific facilities like Megan’s.
The district court found that the legislature, in repealing the six-cent law, intended to protect rate-payers from a subsidy which had outlived its purpose. That court, however, failed to give proper weight to the legislature’s distinct goal of using a grandfather provision to mitigate the disruption of settled arrangements caused by the change in the law. The legislature may have acted out of a conviction that fairness requires transitional accommodations, or it may have wished to protect its good name with investors by not pulling the legal rug out from underneath investments it induced.
The old law created a mechanism for the state to require utilities to enter contracts with alternative suppliers of power, and the new law followed the old one by protecting the very contracts it had created. The statute gives no indication that the legislature meant to narrow the class of beneficiaries under the old law, only that it intended to end the subsidy prospectively. Accordingly, absent some other reason to terminate Megan’s contract with Niagara, such as a finding of material breach, or a determination of invalidity from the FERC or the PSC, we see no basis for the conclusion that the change in the Public Service Law affected the contract’s validity.
*677 The PPA, as the bankruptcy court observed, is the linchpin for the development of a co-generation facility. In this case, it was and is Megan’s greatest asset. The NBNE made its substantial loan to Megan in reliance upon the PPA and other promises from Niagara.[5] Such investments are precisely the type New York’s legislature apparently intended to shield from the change in policy brought by the new law.
Niagara urges us to read the statute in light of ConEd. Nothing in ConEd, however, compels us to alter the apparent meaning of the grandfather clause. ConEd was an Article 78 proceeding challenging a decision of the PSC ordering ConEdison to make certain purchases of electricity. It held that the state PSC may not compel utilities to purchase power from facilities that do not meet federal standards, or, in other words, that “the PSC’s assertion of jurisdiction over purely State qualifying facilities is preempted by the FPA.” ConEd, 63 N.Y.2d at 441, 483 N.Y.S.2d 153, 472 N.E.2d 981. The decision did not concern an existing PPA, or address questions related to non-compliance under an existing contract. Nor did it give the legislature reason to exempt contracts like Megan’s from the grandfather provision, or affect the legislature’s power to include them if it wished to do so.
The district court’s decision departs from the language used by the New York legislature. For us to require Megan to have achieved federal QF status to qualify for grandfathering, we would have to import terms into the statute. We will not do so where such a construction narrows language of general application, and where the statute does not indicate that the legislature intended such a limitation. While all transitions in legal rules may inevitably produce winners and losers, the New York legislature, by the use of a grandfather clause, sought to mitigate the disruption of settled plans caused by the reversal of the six-cent law. The bankruptcy court’s decision properly advanced that goal. Accordingly, the judgment of the district court is reversed, the decision of the bankruptcy court affirmed in all respects, and the case remanded for reinstatement of the bankruptcy court judgment and for further proceedings.

. After 1981, Public Service Law § 66-c provided:
[T]he [Public Service C]ommission shall require any electric corporation or steam corporation (a) to enter into long-term contracts to purchase or wheel electricity or useful thermal energy from any alternate energy production, small hydro or cogeneration facility under such terms and conditions as the commission shall find just and economically reasonable to the corporation’s ratepayers, non-discriminatory to co-generators, small hydro producers and alternate energy producers and further the public policy set forth herein; provided, however, the commission shall establish a minimum sales price for such purchased electricity from any such facility developed on or after June twenty-six, nineteen hundred eighty, of at least six cents per kilowatt hour for each utility....
N.Y.Pub.Serv. Law § 66-c (1) (McKinney 1989) (repealed in part 1992).

. The preamble to the regulations issued by the FERC in 1980 indicated that the states had the power to enact legislation requiring utilities to pay alternative sources for power at rates in excess of the federal, avoided-cost cap. In a recent decision, the agency recanted, saying that federal law does preempt states from setting rates higher than a utility’s avoided cost. See Connecticut Light and Power, 70 FERC ¶ 61,012, 1995 WL 9931 (F.E.R.C. Jan. 11, 1995) (acknowledging the conflict with the 1980 preamble). The agency, however, declined to apply its ruling retroactively where doing so would disturb existing contracts. This decision was supported by a waiver rationale: “The appropriate time to challenge a state-imposed rate is up to or at the time the contract is signed, not several years into the contract which heretofore has been satisfactory to both parties." Id. Whether the New York law upon which the PPA was based was unconstitutional under the Supremacy Clause because it conflicts with a federal policy, or whether the FERC’s bait-and-switch federalism was proper, are questions that are not the subject of this appeal.

. Most recently, the FERC ordered Megan to pay to Niagara the difference between the six-cent rate and the lower "economy energy” cost of Niagara for the period of non-compliance with federal standards. In re Megan-Racine Assocs., Inc., 76 FERC ¶ 61,354, 1996 WL 555640 (F.E.R.C. Sept. 30, 1996).

. Niagara’s motion for summary judgment, seeking leave to terminate the PPA on the ground that Megan-Racine failed to operate as a QF from 1991 to 1994 and thereby breached a material condition of the contract, is sub judice in the bankruptcy court.

. In a consent executed on August 8, 1989, Niagara agreed to the assignment of the PPA to NBNE as security for its loan. Niagara also agreed not to take any action to terminate the PPA without first providing notice to NBNE and giving it 180 days to cure any breach, and to accept performance of Megan’s obligations under the PPA from NBNE, in the event NBNE should foreclose upon Megan.