**In re Earll and Carol HOLDEN, Debtors.**

**Earll and Carol Holden, Plaintiffs,**

**v.**

**United States of America (Internal Revenue Service), Defendants.**

**Bankruptcy No. 96–10549.
Adversary No.97–1020.**

United States Bankruptcy Court, D. Vermont.

July 21, 1999.

R.H. Coutant, Salmon & Nostrand, Bellows Falls, VT and G.F. Walsh, VT Legal Aid Inc., Springfield, VT, for Earll and Carol Holden.

M. Ranaldo, Assistant United States Attorney, Burlington, VT and P. Sklarew, United States Department of Justice Tax Division, Washington D.C., for United States of America.

## MEMORANDUM OF DECISION HOLDING IRS ACTIONS IN VIOLATION OF AUTOMATIC STAY AND IN CONTEMPT OF CHAPTER 13 PLAN CONFIRMATION ORDER

FRANCIS G. CONRAD, Bankruptcy Judge.

Debtors claim that IRS violated the automatic stay and plan confirmation order when it placed an administrative freeze on their tax refund. We hold[1] that IRS violated §§ 362(a)(3) and (6) of the Bankruptcy Code, and that IRS acted in contempt of the Chapter 13 plan confirmation order when it froze Debtors' tax refund.

### FACTUAL[2] AND PROCEDURAL HISTORY

Debtors filed a Chapter 13 petition on May 23, 1996. Their petition listed a 1992 underpayment of taxes owed to IRS as an unsecured priority debt in the amount of $193. Debtors served IRS with a copy of the schedules and the proposed Chapter 13 plan on August 12, 1996. The plan proposed that Debtors pay $199 per month to the Chapter 13 Trustee, and provided for full payment of the IRS debt. IRS did not object to confirmation, and the plan was confirmed on September 19, 1996.

By February of 1997, Debtors were approximately three (3) months behind in their plan payments. That February, Debtors filed their Form 1040 personal income tax return for the year 1996, claiming an overpayment refund due of $2,007. The refund was not timely received, and upon inquiry, Debtors were told by IRS bankruptcy specialist[3] Kenneth Farley that IRS had frozen Debtors' refund.

On March 31, 1997, Debtors filed a complaint for monetary damages, attorneys' fees, injunctive relief and declaratory relief against IRS for its alleged violation of the automatic stay (citing 11 U.S.C. § 362(a)(6) and (7)),[4] alleged violation of the Court's order confirming Debtors' Chapter 13 Plan, alleged violation of the anti-discrimination provisions of 11 U.S.C. § 525, and alleged violations of Debtors' right to Due

---

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the General Reference to the Court by the District of Vermont. This is a core matter under 28 U.S.C. §§ 157(b)(2)(A) and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed.R.Bankr.P. 7052.

2. The parties stipulated that IRS followed its standard procedures in dealing with Debtors. Accordingly, in-depth factual findings regarding IRS' conduct in this particular case are

not necessary. Rather, the real issue is whether IRS' former general procedure of placing V-freezes on post-petition refunds violated the automatic stay.

3. Kenneth Farley, a former bankruptcy specialist for IRS, and Nancy Dubicki, Field Group Manager for IRS, were the only two witnesses who testified at trial. Both witnesses explained the IRS V–Freeze procedure. See pages 159–160 *infra*.

4. Debtor has since added the contention that the IRS's actions violated § 362(a)(3) as well.

Process.[5] On May 21, 1997, we approved a stipulation filed by the parties whereby the IRS agreed to issue a $990.60 check to the Chapter 13 Trustee in order to cure Debtors' plan defaults and to convey the balance of the tax refund directly to Debtors.

On the day of trial, the parties stipulated to a partial settlement of the following issues:

a. The United States would pay $2,000 to Debtors who, in turn, agreed that for the rest of the case it would be deemed that IRS and the IRS Special Procedures Office had followed its standard procedure for dealing with inquiries from Chapter 13 Debtors about refunds, and that there was no bad faith or attempt to coerce a setoff or immediate payment of the pre-petition debt.

b. Debtors waived the right to claim a violation of § 362(a)(7) in light of the parties stipulation that the 1996 overpayment is not an obligation to the debtors "that arose before the commencement of the case" within the ambit of § 362(a)(7). The debtors also waived the right to claim a violation of § 525.

c. Debtors reserved contentions that the practice followed by the IRS violated § 362(a)(3) or (6) (the latter only on the contention that the freeze is for eventual collection, because Debtors waived allegations of bad faith or coercion specific to this case). Debtors reserved the contention that the IRS's actions under its standard practice were in contempt of the confirmation order.

d. If Debtors were entitled to damages under any of their reserved theories, that damages were $1,000 in general damages and $7,000 in emotional damages. The United States reserved the night to appeal the Court's prior rejection of its argument that § 362(h) does not cover emotional damages.

e. If Debtors did not win on damages (not counting the $2,000 being paid to settle the bad faith/coercion contentions referred to under item 'a' above), no attorneys fees would be awarded. If Debtors won damages, then the United States would pay $12,500 in attorney fees for all work through the conclusion of the case in the Bankruptcy Court. If Debtors won and the government appealed and lost, then the government would pay additional attorney fees incurred in any appeals not to exceed $5,000 (for a maximum attorney fees award of $17,500).

f. Debtors reserved contentions that the IRS's failure to notify Debtors of its practice of freezing refunds violated the Due Process clause of the Fifth Amendment, for purposes of declaratory and/or injunctive relief. [the constitutional issues were later rendered moot] [6]

g. The government waived the right, in this case only, to seek a modification of Second Circuit precedent treating

5. On May 19, 1997, IRS filed a Motion to Dismiss the adversary proceeding for failure to state a claim upon which relief could be granted under Fed.R.Civ.P. 12(b)(6). On June 11, we heard the motion, and ruled from the bench in favor of the IRS. Debtors appealed to the District Court of Vermont. On November 12, 1997, the District Court, noting that Debtors' allegations raised questions regarding IRS' compliance with the automatic stay, issued its Memorandum of Decision and Order reversing our ruling and remanding the matter for further proceedings.

6. Under their constitutional claims, Debtors sought injunctive and declaratory relief, be-

cause Debtors were concerned that IRS would continue to institute the V-freeze on their post-petition refunds throughout the plan. After trial, but before we issued our decision, IRS notified the Court that it had changed its policy and no longer instituted V-freezes on post-petition refunds due Debtors. IRS submitted an affidavit of James Spinale, manager of the two Insolvency Units of the Office of Special Procedures of IRS' New England District, which described IRS' new procedure for automatically refunding post-petition refunds due to debtors. On June 17, 1999, we ruled that the Debtors' constitutional claims for declaratory and injunctive relief

any willful act that violates the stay with the knowledge thereof as a "willful violation" (although the government did not concede, for other cases, that this interpretation of willful violation was correct). Accordingly, if a stay violation was found, it would be deemed willful.

During the time period in question, it was IRS policy to input a freeze code (the "V-freeze") into its computerized accounting system when a taxpayer declared bankruptcy. Tax refunds owed to debtors were only frozen if the debtor owed money to the IRS. IRS made no effort to notify such debtor that his or her tax refund had been administratively frozen. Rather, it was IRS policy to wait until a debtor realized that his/her refund was late, and it is was that debtor's duty to inquire regarding the status of that refund. When debtors made such an inquiry, an IRS bankruptcy specialist determined whether or not the debtor was current with his/her plan payments. If the debtor was current, IRS released the V-freeze. If the debtor was not current, IRS policy allowed the bankruptcy specialist to tell the debtor that he or she may obtain his or her refund by curing the plan arrearage (IRS offered to do so by sending the necessary part of the refund to Chapter 13 Trustee). Sometimes, IRS also offered debtors the option of paying the IRS debt in full, and the IRS would then release the remaining refund to the debtor.

## DISCUSSION

### I. The V-freeze as imposed by IRS violates § 362(a)(3).

Debtors first claim is that the V-freeze as imposed by the IRS violates § 362(a)(3),

which prohibits post-petition actions by creditors that exercise control over property of the estate. We must first determine whether or not Debtors' post-petition refund qualifies as property of the estate. Property of the estate under Chapter 13 is defined by 11 U.S.C. § 1306(a), which states:

(a) Property of the estate includes, in addition to the property specified in section 541 of this title—

viii. all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title whichever occurs first; and

ix. earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

11 U.S.C. § 1306(a).

Under the § 1306(a) definition, it would seem that Debtors' post-petition [7] tax refund would be property of the estate because it is "property ... the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted...."

The issue, unfortunately, is not that simple. 11 U.S.C. § 1327(b) states, "[e]xcept as otherwise provided in the plan or in the order confirming the plan, the confirmation of a plan vests all of the property in

had therefore become moot, and said that we would decline to rule on the constitutional claims. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Assoc.*, 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988).

7. The Debtor and IRS have stipulated that the tax refund became due post-petition. "Debtors waived the right to claim a violation of § 362(a)(7) in light of the parties stipulation that the 1996 overpayment is not an obligation to the debtors 'that arose before the commencement of the case' within the ambit of § 362(a)(7). The debtors also waived the right to claim a violation of § 525."

the estate of the debtor." 11 U.S.C. § 1327(b)(2). Accordingly, once that pre-confirmation estate property vests in a debtor upon plan confirmation, it no longer can be considered property of the estate.

"Sections 1306(a) and 1327(b) are difficult to reconcile." *In re Rangel*, 233 B.R. 191, 194 (Bankr.D.Mass.1999). On one hand, § 1306(a) says that the estate continues to collect property until the case is closed, converted, or dismissed. On the other hand, § 1327(b)(2) seems to call for the termination of the estate upon plan confirmation. We, along with other courts, have struggled with the interplay between these statutes. "We must confess that we find neither § 1327(b) or § 1306 to be models of clarity." *In re Clark*, 71 B.R. 747, 749 (Bankr.E.D.Pa.1987). The two sections, in effect, seem mutually exclusive. "Remedial legislative drafting would more appropriately solve the conundrum over which all of the above authorities have labored so long with varying results." *In re Ziegler*, 136 B.R. 497, 502 (Bankr. N.D.Ill.1992). Four distinct lines of cases have emerged.

The first line of cases stresses the effect of the 'vesting' of estate property in a debtor under § 1327(b). The confirmation order is deemed to terminate the estate, and all property that had been property of the estate revests in the Debtor. *Oliver v. Toth (In re Oliver)*, 193 B.R. 992 (Bankr. N.D.Ga.1996); *In re Rhodes*, 1995 WL 128486 (Bankr.D.Idaho 1995); *In re Petruccelli*, 113 B.R. 5 (Bankr.S.D.Cal.1990); *In re Mason*, 45 B.R. 498, 500 (Bankr. D.Or.1984), aff'd 51 B.R. 548 (D.Or.1985). Under this theory, after confirmation there is no longer any estate property to be protected under § 362(a)(3).

The second line of cases, giving much weight to § 1306(a), holds that all property acquired by a debtor from the petition date through conversion, dismissal, or closure of the case becomes and remains property of the estate. Confirmation does not effect the continuance of the Chapter 13 estate or the status of estate property.

*Security Bank of Marshalltown v. Neiman*, 1 F.3d 687 (8th Cir.1993); *In re Price*, 130 B.R. 259 (N.D.Ill.1991); *In re Root*, 61 B.R. 984 (Bankr.D.Colo.1986).

The third line of cases holds that upon confirmation, all property except that property needed to fund the Chapter 13 Plan revests in a debtor under § 1327(b). After confirmation, only property that is needed to fund the plan becomes estate property. *In re Leavell*, 190 B.R. 536 (Bankr.E.D.Va.1995); *In re Ziegler*, 136 B.R. 497 (Bankr.N.D.Ill.1992); *Riddle v. Aneiro (In re Aneiro)*, 72 B.R. 424 (Bankr. S.D.Cal.1987). These decisions are based upon the policy that "the automatic stay should only protect that portion of a debtor's income which [sic] is devoted to the plan; the remainder of a debtor's income need not be protected from a debtor's post-petition financial mishaps." *In re Rangel*, 233 B.R. at 195.

The fourth, and most recent line of cases to emerge, holds that upon confirmation, all property vests in a debtor under § 1327(b). Immediately subsequent to confirmation, the estate begins to be refilled by all property acquired post-confirmation until the case is closed, dismissed, or converted. *In re Rangel*, 233 B.R. at 198; *City of Chicago v. Fisher (In re Fisher)*, 203 B.R. 958 (Bankr.N.D.Ill.1997).

The fourth line of cases is similar to the third line in that they both hold that the estate continues to collect property even after pre-confirmation estate property vests in a debtor under § 1327(b). However, the fourth line of cases does not make a distinction between property that is necessary for plan payments. Rather, all property acquired post-confirmation becomes property of the § 1306(a) estate. We adopt this view, because it is the only view which gives full effect to the plain meaning of both statutes.

█ The first view which says that the estate terminates after confirmation cannot be valid. This view renders the broad language of § 1306(a) toothless. Further,

other statutes acknowledge the existence of a post-confirmation estate.[8] "[If] Congress had intended for confirmation to so dramatically affect the expansive definition of property of the estate found in § 1306, it knew how to draft such a provision." *In re Aneiro*, 72 B.R. at 428–29. There are other inherent problems with this approach as well:

> In addition to the problems with statutory construction, such a theory means that if a Chapter 13 debtor were to obtain a windfall one day after confirmation, such a windfall would not be available to creditors. It also means that a post-petition creditor could attach those wages which a debtor needs to fulfill the terms of the plan without running afoul of the automatic stay.

*In re Rangel*, 233 B.R. at 196.

■ For similar reasons, the second view, which holds that confirmation does not effect the estate, cannot be valid, because such a reading ignores the express wording of § 1327(b). If the property vests in the debtor, it cannot remain property of the estate. *See In re Fisher*, 203 B.R. at 961 ("the term 'vests' in § 1327(b) does effect a change in the estate and its property.")

■ The third line of cases suffers from flaws as well. First of all, it reads into § 1306(a) a requirement that property of the post-confirmation estate be necessary to make plan payments, although that requirement contradicts the expansive language of § 1306(a). Secondly, it is not clear exactly what becomes property of the estate under this formulation, because debtors, creditors, and the court may differ on exactly which property is 'necessary' to make plan payments.[9]

IRS argues that the fourth view, which gives a broad definition to property of the estate, will hinder Debtors from obtaining post-confirmation credit because it will render the automatic stay applicable to an expansive category of property. This is a valid concern, but we are constrained by the statutory text, and we refuse to read nonexistent requirements into the statute merely because it might help post-confirmation debtors obtain credit. Such policy considerations should be considered at the legislative level, not here:

> If the theory behind Chapter 13 is that a debtor is to devote disposable income to the repayment of creditors, it is unclear why the Code should be interpreted to enable a debtor to incur more debt. Second, the Code and local rules contemplate oversight of the obtaining of credit post-petition. Third, the Code provides a mechanism for the repayment of a creditor who has extended credit for property or services which were necessary for a debtor to effectuate the plan. That Congress chose not to include all post-petition creditors seems to indicate that those creditors who extend credit for property or services which are not necessary to the plan do so at the peril of not being able to collect on that debt

---

8. *See* §§ 349(b)(3) and § 704(9); *also see In re Rangel*, 233 B.R. at 195 ("Furthermore, it would render unnecessary the application of Fed.R.Bankr.P. 4001 and 6004 post-confirmation as a debtor would not have to seek court approval to sell or encumber real property which is not property of the estate.")

9. IRS claims to have a solution to this conundrum—it says that only property and income that is explicitly listed in the plan becomes property of the post-confirmation estate. *See In re Heath*, 198 B.R. 298 (S.D.Ind.1996). We disagree. Property of the estate has historically been defined as broadly as possible. *Official Committee of Unsecured Creditors v.*

*PSS Steamship Co., Inc. (In re Prudential Lines, Inc.)*, 928 F.2d 565, 568 (2d Cir.1991) ("we are mindful that Congress intended § 541 [which is incorporated into § 1306(a) ] is to be interpreted broadly.") We see no reason to differ from this policy here. *See In re Fisher*, 203 B.R. at 962. ("While protecting such funds [explicitly mentioned in the plan to fund plan payments] may be salutary policy, the Bankruptcy Code does not, in defining what property is in the estate, distinguish between earnings and other property. Although the pertinent statutes are not crystal clear, we are still constrained by their text....")

until the debtor is free form the bankruptcy.... Such a conclusion makes sense in light of the Code policy that all of a debtor's income, not just a portion, should be dedicated to the plan.

*In re Rangel*, 233 B.R. at 195.

■ For the above-mentioned reasons, we adopt the fourth view of the interplay between § 1306(a) and § 1327(b), and hold that upon confirmation of a Chapter 13 plan, all property of the estate is emptied from the estate and revested in the Debtors under § 1327(b). Such property is no longer property of the estate. Immediately after confirmation, the estate begins to be refilled by property acquired by Debtors post-confirmation. That property is protected by the automatic stay and remains so until the case is closed, converted, or dismissed. *See In re Rangel*, 233 B.R. at 198; *In re Fisher*, 203 B.R. at 962.

■ IRS argues that even if all post-confirmation property remains property of the estate until the case is closed, the Supreme Court's interpretation of § 362(a)(3) in *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) validates the use of the V-freeze as instituted by the IRS.

In *Strumpf*, the United States Supreme Court held that a bank's temporary administrative freeze of a debtor's account while the bank sought to enforce its rights to a § 553(a)[10] setoff did not violate § 362(a)(3). *Strumpf*, 516 U.S. at 21, 116 S.Ct. at 290. *Strumpf* held that the bank's freeze did not actually control property of the estate, but was rather a mere refusal of the bank to perform on a promise:

> Respondent's reliance on these provisions rests on the false premise that petitioner's administrative hold took something from respondent, or exercised dominion over property that belonged to respondent. That view of things might be arguable if a bank account consisted of money belonging to the depositor and held by the bank. In fact, however, it consists of nothing more or less than a promise to pay, from the bank to the depositor, and petitioners temporary refusal to pay was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise. In any event, we will not give §§ 362(a)(3) or (6) an interpretation that would proscribe § 542(b)'s 'exception' and § 553(a)'s general rule were intended to permit.

*Id.*

IRS argues that, akin to the bank's temporary freeze in *Strumpf*, the V-freeze imposed by the IRS did not "take control" of estate property. IRS claims that it merely refused to perform its promise to Debtors to refund their taxes.

■ Before examining the inherent problems with IRS' analogy, we first note that we should construe *Strumpf's* holding narrowly. "It is a fundamental axiom of bankruptcy law that the automatic stay is pervasive and exemptions from the stay are strictly construed. The logic of the foregoing compels a narrow reading of *Strumpf*. In addition, the language of the decision itself dictates that its holding is limited to the so called 'bankers dilemma' of preserving a creditor's setoff rights." *In re Megan–Racine Assocs., Inc.*, 203 B.R. 873, 882 (Bankr.N.D.N.Y.1996) (rev'd on other grounds 198 B.R. 650 (N.D.N.Y. 1996)) (rev'd on other grounds 102 F.3d 671 (2d Cir.1996)). There is no such 'dilemma' presented here because IRS admittedly had no right to setoff. "[Creditor's] reliance on *Strumpf* is misplaced because [creditor], unlike the Citizens Bank of Maryland, is not seeking to preserve the set off rights provided by § 542(b) and § 553."

**10.** The applicable portion of § 553(a) states "... this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under his title against a claim of such creditor against the debtor that arose before the commencement of the case ..." 11 U.S.C. § 553(a).

*In re Megan–Racine Assoc., Inc.*, 203 B.R. at 881–82 (Bankr.N.D.N.Y.1996).

Even a broad reading of *Strumpf*, however, would not render it's holding applicable here. In *Strumpf*, the Court held that the bank's temporary freeze did not violate § 362(a)(3) because the property being controlled was not estate property. "*Strumpf*, however, is not directly on point . . . . the U.S. Supreme Court ruling rested not on a limitation of the scope of Section 362(a)(3), but on its finding that the action at issue did not deprive the estate of property." *In re National Environmental Waste Corporation*, 191 B.R. 832, 836 (Bankr.C.D.Cal.1996). Accordingly, courts have refused to follow *Strumpf's* § 362(a)(3) analysis when the property being administratively frozen or controlled is property of the estate. *In re National Environmental Waste Corporation*, 191 B.R. at 836. ("since Ninth Circuit law holds that contract rights constitute property of the estate, the City's unilateral termination of Newco's contract is clearly an action exercising control over property of the estate" rendering *Strumpf's* analysis inapplicable.); *In re Megan–Racine Associates, Inc.*, 203 B.R. at 882 (holding that an executory contract is property of the estate, and that *Strumpf's* holding regarding § 362(a) does not control.)

■ There is no question that a tax refund or a right thereto is property of the estate.[11] *Holden v. United States of America (In re Holden)*, 217 B.R. 161, 164 (D.Vt.1997) ("A tax refund is a debt that becomes property of the estate."); *In re Prudential Lines, Inc.*, 928 F.2d 565, 571 (2d Cir.1991) ("the right to a [tax] refund is property of the estate"); *Wilson v. IRS (In re Wilson)*, 29 B.R. 54 (Bankr. W.D.Ark.1982) (noting that inchoate right to tax refund was property of the estate). Accordingly, *Strumpf's* § 362(a)(3) analysis does not apply.

■ Further, there is no question that the V-freeze, which indefinitely delayed Debtors' receipt of their refund, was an exercise of control over estate property. "Withholding possession of property from a bankruptcy estate is the essence of 'exercising control' over possession." *Transouth Financial Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 682 (6th Cir. BAP 1999); *see also Hudson v. United States of America*, 168 B.R. 449, 452 (Bankr.S.D.Ga. 1994) ("The conduct of the IRS in withholding the debtor's prepetition tax refund without promptly seeking relief from the

11. Because the mere right to a tax refund is property of the estate, we realize that a *pro rata* portion of this right may have 'vested' in Debtors under § 1327(b) upon confirmation, and therefore the right to that refund was no longer property of the estate post-confirmation. Accordingly, any *pro rata* right that Debtors had to a tax refund prior to the confirmation date would no longer be protected under § 362(a)(3). Any *pro rata* right to the refund received after confirmation would be property of the post-confirmation § 1306(a) estate and subject to the automatic stay rendering § 362(a)(3) applicable.

Technically, therefore, IRS did not violate § 362(a)(3) when it withheld the pre-confirmation *pro rata* portion of the refund, because the right to that refund was no longer 'property of the estate' under § 1306(a). However, in retaining all of the refund, the IRS undoubtedly retained the *pro rata* amount due post-confirmation, which was estate property.

We note that this conclusion does not effect our § 362(a)(6) analysis, because that section need not involve property of the estate.

IRS might argue, although it does not, that since a *pro rata* portion of the refund became property of the estate pre-confirmation, that the *pro rata* portion which vested in Debtors prepetition should be available for setoff under § 553(a). "Given the fact that the albeit inchoate, right to a tax refund was 'property of the estate' at the time of the filing of the debtors' petition herein, it would be anomalous to now hold that it concurrently lacked sufficient specificity and mutuality to permit an offset . . ." *In re Warden*, 36 B.R. 968, 970 (Bankr.D.Utah 1984) (quoting *In re Wilson*, 29 B.R. 54 (Bankr.W.D.Ark.1982)).

IRS cannot make this argument, however, because IRS stipulated that the refund due Debtors was deemed post-petition in nature. The mutuality requirement of § 553(a) (*see* note 10 *supra*) is therefore not satisfied, because the 1992 debt owed to the IRS is undoubtedly prepetition.

stay of § 362(a) in order to accomplish a setoff when it had full notice of the debtor's bankruptcy violates 11 U.S.C. § 362(a)(3) giving rise to damages pursuant to 11 U.S.C. § 362(h).") Although the delay in this case only amounted to a number of days, it could have continued indefinitely, and we note that even delays for relatively short periods constitute violations of § 362(a)(3). *In re Flynn*, 185 B.R. 89 (S.D.Ga.1995) (IRS delay of fourteen days in releasing lien on estate property violation of stay); *In re Solis*, 137 B.R. 121 (Bankr.S.D.N.Y.1992) (eleven day delay in releasing levy on funds violates stay). Accordingly, we find that IRS violated § 362(a)(3) when it froze Debtors' tax refund. *Strumpf* simply does not apply to the facts of this case.[12]

For the reasons mentioned above, we find that the refund due Debtors was property of the estate under § 1306(a), and that IRS exercised control over that property in placing a V-freeze on the refund thereby violating § 362(a)(3).

## II. The V-freeze as imposed by IRS violates § 362(a)(6).

Debtors next claim that IRS' imposition of the V-freeze violates § 362(a)(6). That section automatically stays and prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title". Debtors claim that the freeze was an act to collect the prepetition debt owed to IRS.

Again, IRS argues that *Strumpf* controls here, and again, we disagree. First, as noted above, *Strumpf* was concerned with a bank who was seeking to assert its pre-petition right of setoff under § 553(a). "[W]e will not give ... § 362(a)(6) an interpretation that would proscribe what § 542(b)'s 'exception' and § 553(a)'s general rule were plainly intended to permit: the temporary setoff against a debt owed the bankrupt [sic]." *Strumpf*, 516 U.S. at 21, 116 S.Ct. at 290. The IRS, however, admits it has no right to setoff under § 553(a).[13]

---

**12.** There are many reasons why *Strumpf* does not apply here. Unlike the bank's temporary freeze in *Strumpf*, the V-freeze here was instituted on Debtors' refund without notifying debtor and lasted for an indefinite period. While *Strumpf* held that "[a] temporary refusal to pay was neither a taking of possession nor an exercising of control over ... [debtor's bank account]", the Court was not concerned with, and therefore did not rule on, the validity of a pervasive and indefinite freeze. *See Town of Hempstead Employees Federal Credit Union v. Wicks (In re Wicks)*, 215 B.R. 316, 319 (E.D.N.Y.1997) ("Applying the rules enunciated in *Strumpf*, the Court concludes that the Credit Union's four-month-long administrative hold constituted an impermissible setoff in violation of the automatic stay.")

Further, IRS claimed the right to freeze not only past refunds, but future refunds as well. "This act was similar to placing a continuing garnishment on debtors' future income. The failure of a creditor to remove a continuing garnishment after the automatic stay has become effective has been held to violate the automatic stay." *In re Burrow*, 36 B.R. 960, 964 note 4 (Bankr.D.Utah 1984). No such implications were considered, nor authorized, by the Court in *Strumpf*.

**13.** The parties have stipulated that the refund owed to Debtors arose post-petition. Therefore § 362(a)(7), which prohibits setoffs of prepetition property, does not apply. However, we note that if the refund had been deemed prepetition, the V-freeze instituted by IRS may violate § 362(a)(7) as well. IRS imposed an indefinite freeze on Debtors' refund, and did so without seeking relief from the automatic stay. Debtors were not even notified of the freeze, and would never have been notified, unless they called the IRS and demanded their refund. Further, the amount frozen was much larger than the amount owed to the IRS. Even after *Strumpf*, such actions against prepetition property may be deemed to constitute an impermissible *defacto* setoff. *See Town of Hempstead Employees Federal Credit Union v. Wicks (In re Wicks)*, 215 B.R. 316 (holding that *Strumpf* decision was not on point in situation where Credit Union's four-month long administrative hold on debtor's account constituted impermissible setoff under § 362(a)(7)); *In re Glenn*, 198 B.R. 106 (Bankr.E.D.Pa.1996) (holding that IRS' effectively permanent retention of refund without obtaining relief from stay was impermissible setoff and not a mere temporary freeze which would be allowed under *Strumpf*.)

Because there is no right to setoff the funds in question, we must ask why IRS froze the refund due to Debtors. IRS argues that it placed its freeze to prevent unauthorized automatic setoffs by the IRS. We note that even if this was one of the freeze's purposes, another obvious purpose and effect was to expedite the eventual collection of pre-petition debts due IRS. Other than debt collection, IRS advances no other credible reason[14] for the imposition of the glacial V-freeze. Such a finding is bolstered by the fact that IRS admits that in some instances, its agents would offer inquiring debtors the option of repaying their prepetition IRS debt in full in order to quickly unfreeze the withheld refund. "Because the IRS had no setoff rights, its placement and retention of a signal on its computer which prevented the issuance of debtors' refund check was an act to collect or recover the IRS' prepetition tax claim prohibited by 11 U.S.C. § 362(a)(6).... Thus, holding the refund for collection was also an act to collect or recover a debt within the meaning of Section 362(a)(6)." *In re Burrow*, 36 B.R. 960, 964 (Bankr.D.Utah 1984). Accordingly, we find that IRS violated § 362(a)(6) when it withheld the Debtors' refund.

### III. The V-freeze as imposed by IRS violates the plan's Confirmation Order

■ Debtors next claim that the V-freeze was in contempt of the Chapter 13 Plan Confirmation Order. IRS argues that the plan only provides for the manner of payment by Debtors, and does not preclude IRS from retaining Debtors' tax refund.

■ Under § 1327 of the Bankruptcy Code, confirmation of the Chapter 13 plan binds both debtors and creditors to the terms of the plan, and lists all rights of the parties thereunder.[15] Under the confirmed plan, IRS is listed as an unsecured creditor. Debtors and all of Debtors' creditors are entitled to rely on that plan, and it would be inequitable to Debtors and all creditors to allow IRS to retain property of the estate as security on a prepetition debt when the IRS is indisputably listed as an unsecured creditor with no right to setoff.

■ IRS claims its V-freeze is needed in order to protect itself if Debtors default on their plan and it is dismissed without a discharge. We disagree. No such adequate protection or quasi-security interest is provided for in the plan. "Because creditors are limited to those rights that they are afforded by the plan, they may not take actions to collect debts that are inconsistent with the method of payment provided for in the plan." 8 *Collier on Bankruptcy*, ¶ 1327.02[1][b] (Matthew Bender 15th Ed. Revised 1996). As an unsecured creditor, IRS has no more authority to demand, retain, control, or threaten to repossess estate property as security for its unsecured debt than any other unsecured creditor. IRS retained no right to be treated as a secured creditor, because post-confirmation creditors "may not later assert any interest other than that provided for it by the confirmed

---

14. We are not convinced by IRS' claim that the V-freeze is the only reasonably efficient manner to deal with Debtors in Chapter 13 cases. As another court noted rather simply, "[i]f a computer can be told to hold and offset a tax refund, it can be told to release a tax refund. Surely, once a plan had been confirmed, the IRS could have canceled the computer's hold on debtors' tax refund and could have ordered the computer not to make a setoff." *In re Burrow*, 36 B.R. 960 (Bankr. D.Utah 1984).

IRS does not deserve special treatment or exemptions from the automatic stay because it could not figure out a way to program its computers to act in a legally permissible manner. No other creditor enjoys such immunity, and we flatly refuse to confer such immunity here.

15. "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." 11 U.S.C. § 1327(a).

plan." *In re Eason,* 178 B.R. 908, 911 (Bankr.M.D.Ga.1994). Accordingly, IRS acted in contempt of the confirmation order when it withheld estate property without any right to do so.[16]

### CONCLUSION

We find that IRS' V-freeze violated §§ 362(a)(3) and (6), and that the V-freeze as instituted was is in contempt of Debtors' Chapter 13 Plan Confirmation Order. In accordance with the parties' pre-trial stipulation, Debtors are entitled to $1000 in general damages and $7000 in emotional damages, as well as $12,500 in attorneys fees.[17] Counsel for Debtors to enter an order consistent with this opinion within five (5) days.

---

16. Because IRS had no setoff right, we need not address the issue of whether or not the confirmation of a chapter 13 plan negates pre-petition rights to setoffs not mentioned in the plan.

17. IRS previously agreed to pay $2000 in consideration for Debtors' stipulation that IRS followed its general procedures with dealing with Debtors and did not act in bad faith.